(Decided June 5th, 1863.)

THE CUMBERLAND COAL & IRON CO., *vs.* ALLEN M. SHERMAN, ET AL.

PRACTICE IN COURT OF APPEALS.—Where upon appeal the appellate Court decides a question presented by the record, and the cause is remanded, the decision is binding both upon the Court below and the appellate Court, and cannot be reversed upon a second appeal.

PRACTICE IN EQUITY: SALE, RATIFICATION AND VACATION OF.—In this State as elsewhere, it is well settled, that trustees cannot purchase at their own sales either directly or indirectly, and if they do, such purchase will be set aside on the proper and reasonable application of the parties interested.

The same doctrine applies to purchases by persons acting in a fiduciary capacity which imposes upon them the obligation of obtaining the best terms for the vendor, or which has enabled them to acquire a knowledge of the property; a director in a corporation holds such a relation to its stockholders.

To render the ratification of such a sale effective and conclusive, the principal must at the time of the ratification be fully aware of every material fact, and his act of ratification, be an independent substantive act, founded on complete information, and he must not only be aware of the facts, *but apprised of the law* as to how these facts would be dealt with if brought before a Court of Equity.

Where an express ratification of the sale of a portion of its lands by an incorporated company was sought to be established, by proof of the verbal adoption of a motion of confirmation at a meeting of its stockholders, it was in evidence, that three-fourths of the stock voted at said meeting was

represented by directors connected with the sale, either advising, participating in or sustaining it; that the motion to confirm was not reduced to writing nor entered upon the minutes of the meeting; that the stockholders being still in session, and the whole subject still under their control, on discovering objections to the contract, instead of rescinding it, solicited not as a matter of right, but as a concession, a release from or modification of it; that the act of confirmation was rather an accident than a deliberate act; and that no notice had been given to the stockholders as a class, that at the said meeting the sale would be before them for rejection or confirmation. HELD:

1st. That the company had not forfeited their right to rescind said contract, and to have the property reconveyed upon terms consistent with equity.

2nd. That the release from or modification of the contract being accepted in ignorance of their rights, instead of operating as a *quasi* confirmation, is evidence of such *crassa ignorantia* as annuls the whole contract.

3rd. That no man acting under a plain and acknowledged mistake of his legal rights, shall forfeit those rights in consequence of such misapprehension.

4th. Confirmation must be a solemn, deliberate act, "not fished out from loose expressions in a letter," and where the original transaction was infected with fraud, the Court will watch it with the utmost strictness, and not allow it to stand but on the clearest evidence.

Where matters of account between complainants and defendant, occupying also the relation of vendors and vendee, are such as to render necessary an adjustment of their accounts by an audit, in order to ascertain what amount of the assetts of the former are in the hands of the latter; the vendors alleging in their bill of complaint that nothing had been actually received by them, equity will not require an offer to refund as a condition precedent to the right or act of rescission.

The necessity or propriety of a tender or offer to refund, depending entirely upon the existence of the fact of *bona fide* payments, if that fact should appear from an audit of the accounts, it would be ground for the Court to require re-payment of the amount advanced before the execution of a re-conveyance, but it is not so controlling as to suspend the power of this Court in granting the mere partial relief by injunction.

APPEAL from the equity side of the Circuit Court for Allegany County:

This appeal is taken from a final decree of the Circuit Court for Allegany County, sitting in equity, dissolving the injunction, which had been previously granted and continued, and dismissing the complainants' bill. The case was heretofore before this Court on an appeal by the

present appellees from the orders of the Court below refusing to dissolve and continuing the injunction until final hearing, and will be found reported in 16 *Md. Rep.*, 456. The statement of the proceedings in the cause there made, will be found to embrace all that is now essential to be presented, excepting the additional testimony taken since the cause was remanded, which is stated in substance in the opinion of this Court.

The cause was argued before Bowie, C. J., and Bartol, Goldsborough and Cochran, J.

*G. A. Thruston* and *G. W. Dobbin*, for the appellant:

After the trial of the motion to dissolve, twice in the Court below, and once upon appeal in this Court, an entirely new defence has been taken, never before heard of or intimated, but now for the first time brought to light, although the defendants had answered with elaborate minuteness and care, and had never referred to it, and most of the witnesses by whom it is attempted to be sustained, had been fully examined and had never mentioned it.

This defence is, that at the general meeting of stockholders, held on the 1st June 1857, a stockholder present, whose name some of the witnesses do not recollect, and others state to have been a Mr. Grosvenor, since dead, moved that the sale made to Sherman and Dean be confirmed, which motion was carried.

The recorded minutes of this meeting make no mention of this resolution, although that part of them which particularly relates to this sale of lands, was drawn by Sherman himself, and they were read at the first meeting of directors held thereafter, at which most of the witnesses who now testify as to them, were present, without any suggestion insufficiency, omission or error.

The main question to be decided on this appeal is, whether the sale of those lands to Sherman and Dean, which this Court by its former judgment has declared to

be void, has been ratified and confirmed by the stockhold=
ers, under circumstances of full knowledge of law and
fact to guide their conduct in a meeting legally competent
to make such confirmation.

In the argument of the appellants, it is proposed to dis=
cuss this question under three heads, viz:

I. Whether such a resolution ever was in fact passed.

II. Whether, if passed at all, the stockholders, in the
language of this Court's decision, "were *fully* aware of
every material circumstance of the transaction, the real
value of the subject of the contract, and whether their act
of ratification was an independent and substantive act,
founded on complete information, and of perfect freedom
of volition." And whether, "in addition to all this, the
stockholders were not only acquainted with the facts, *but
apprised of the law how those facts would be dealt with if
brought before a Court of Equity.*"

III. Whether the meeting of June 1st, 1857, was legal-
ly competent to ratify and confirm this sale and contract.

I. Whether such a resolution ever was in fact passed.

Under this head, after an elaborate review of the whole
evidence relating to the passage of a resolution of express
confirmation, the appellant's counsel argued, that such evi-
dence instead of being of that clear and conclusive charac-
ter necessary to prove an act which is to deprive a *cestui
que trust* of his estate and give it to his trustee, it was in-
conclusive and uncertain, with the preponderance the other
way.

II. Whether, if such a resolution was passed, it was done
under such a course of conduct on the part of the trustee,
and such a state of information on the part of the stockhold-
ers, as to gratify the decision of this Court with reference
to a confirmation by a *cestui que trust.*

The rule applicable to the case in which the trustee deals
directly with his *cestui que trusts,* and the latter is *sui juris*
and competent to deal independently, throws upon the
trustee the entire *onus* of rebutting the legal presumption

against the transaction, and of proving affirmatively, the conditions necessary to give it validity. "If no such proof is established, Courts of Equity will treat the case as one of constructive fraud." *Story's Eq. J.*, sec. 311; *Sir William Grant, in Randall vs. Errington*, 10 *Ves.*, 427. *Lord Brougham, in Hunter vs. Atkins*, 3 *Myl. R.* 113. *Vice Chan. Wigram in Edwards vs. Meyrick*, 2 *Hare.*, 50, and 68. Note of *Am. Ed.* to *Fox sv. Mackreth, White's Eq. Ca.*, 65 *Law Lib.*, 146.

Those conditions are :

1. That the *cestui que trust* knew that he was dealing with his trustee, and had agreed to discharge him from that relation and capacity.

(*a.*) No single fact can be so material or the knowledge of it so necessary to put the *cestui que trust* on his guard, or the ignorance of it so sure to mislead him, as the fact that his trustee had reversed their relations, and converted himself from a protector to an adversary in the transaction. Ignorance of that fact brings the case within the policy of absolute disability, for the dealing is not really between the trustee and *cestui que trust*, but by the trustee with himself. It becomes the common case of an agent to sell, being himself the buyer, besides the concealment, which is in actual fraud, for which, sales in all other respects capable of being sustained, have been set aside. *Randall vs. Errington*, 10 *Ves.*, 526. *White's Eq. Ca.*, 65 *Law Lib.*, 130. *Story's Eq.*, sec. 316.

(*b.*) The cases not only require that the consent of the *cestui que trust* should be free, full and unequivocal, but will not consider the relation dissolved unless all the duties of the trustee as to the transaction are shown to have been completely fulfilled. *Lord Eldon, ex-parte Lacey*, 6 *Ves.*, 627; and his comment on *Fox vs. Mackreth, in Coles vs. Trecothic*, 9 *Ves.*, 234.

2. That the trustee had communicated all the information which he possessed or could acquire, to the *cestui que trust*.

16    v. 20.

Cumberland Coal & Iron Co. *vs.* Sherman, et al.

(*a.*) It is a duty in this and other confidential relations, to disclose all information possessed.

(*b.*) It is also a duty to acquire all the information that can be attained by reasonable diligence, (all the information "possible," the cases say,) *Ex-parte James*, 8 *Ves.*, 348, &c., for the benefit of the *cestui que trust.*

If a disclosure should be omitted because the trustee was not aware of the duty, or of the materiality of the information, the omission would still be a constructive fraud. "There must be," said Lord Eldon, in *Gordon vs. Gordon,* 3 *Swans.*, 409, (where it was the policy of the law, as far as possible, to uphold the transaction as a family arrangement and amicable settlement, not to discountenance it as a dealing between trustee and *cestui que trust*,) "there must be not only good faith and honest intention, but full disclosure, and without *full disclosure,* honest intention is not sufficient." *Farnum vs. Brooks,* 9 *Pick.*, 234. *Hugenin vs. Basely,* 14 *Ves.*, 300.

If the trustee fail to get information which might be procured by diligent enquiry, and by want of that information a third party should be enabled to obtain an advantage in the bargain, it would be contrary to good conscience to allow the trustee, by coming in as the purchaser, to avail himself of that advantage for his own benefit. *Gibson vs. Jeyes,* 6 *Ves.*, 280.

"The defendant is in this situation, being the person who is to acquire the interest, and also the person who is to advise the grantor; he imposed upon himself the duty of *informing himself fully of the value,* and of acting in favor of his employer, as adversely against himself as he would against any other person with whom, acting fairly for his employer, he was making the best bargain he possibly could." *Lord Eldon in Harris vs. Tremenhere,* 15 *Ves.*, 40. *Howell vs. Ransom,* 11 *Paige*, 541. 65 *Law Lib.*, 137. Generally, as to disclosure. *White's Eq. Ca.* 65 *Law Lib.*, 146, and cases above cited under this point. *Story's Eq.*, sec. 316, (*A.*) See especially *Farnum vs.*

*Brooks,* 9 *Pick.,* 234. *Walker vs. Symonds,* 3 *Swanst.,* 73.

3. That the trustee derived no advantage whatever from his situation as trustee, or from any knowledge acquired in that character. 49 *Law Lib.,* 146, and remarks on *Keech vs. Sandford, Id.,* 371. *Lord Brougham in Hunter vs. Atkins,* 3 *Myl. & K.,* 113, which is a case qualifying rather than extending the doctrine.

4. That the trustee had advised his *cestui que trust* in the same manner as if the dealing of the latter had been with a third party. 65 *Law Lib.,* 133 and 146. *Lord Eldon in Gibson vs. Jeyes,* 6 *Ves.,* 278. *Lord Brougham in Hunter vs. Atkins,* 3 *Myl. & K.,* 113.

5. That the price was fair, the consideration adequate, and the whole bargain just and reasonable. 65 *Law Lib.,* 146. *Gibson vs. Jeyes,* 6 *Ves.,* 280. *Peacock vs. Evans,* 16 *Ves.,* 540. *Edwards vs. Myrick,* 2 *Hare,* 68. See *Butler & others vs. Haskill,* 4 *Dessausure,* 652, for a collection of the cases on inadequacy. See also *Story's Eq., sec.* 321.

Again, as to confirmation of *actual* or *constructive* frauds, or of acts of persons in *confidential relations.*

The rules of law applicable to such cases, are much more strict than in the ordinary dealings between independent and equal parties where there is a merely technical defect of power, or where it is the policy of the law to uphold the transaction. In all dealings between persons in confidential relations, or having just emerged from them, the policy of the law is to look with great suspicion on the transaction, and to discourage such dealings. In the classification of the books, such transactions, however innocent and righteous, are called *constructive* frauds.

For a general and succinct statement of the conditions necessary to make a confirmation valid, see *Lewin on Trusts,* 399; 24 *Law Lib.,* 198; also the edition of 1857, vol. 99 of the Law Library, where the author has simplified his classification, (marg. paging) 778.

1st. The *onus* of proving all the conditions necessary to

make a valid confirmation, is upon the party claiming its benefit.

(*a.*) Because he who sets up a confirmation of a transaction which is *prima facie* invalid, and contrary to the policy of the law, must make out that confirmation.

(*b.*) Because the dealing is between a trustee and a *cestui que trust,* and the rule stated above applies. See cases cited under 1, 2, 3, 4, 5, above. See also *Hill on Trustees,* 827, that the *onus* of showing that the *cestui que trust* had knowledge, is upon the trustee; also *Lord Brougham in Bennett vs. Colley,* 2 *Myl. & Keen,* 232.

2d. The confirmation must have been given by a party *competent* to make a valid act of confirmation, for example, not by a person not *sui juris,* or a minor, &c. *Lewin on Trusts,* 390. 24 *Law Lib.,* 198.

3d. An act of confirmation must be *deliberate, plain* and *distinct. Morse vs. Royal,* 12 *Ves. Jr.,* 337. With knowledge that it will have that *effect. Murray vs. Palmer,* 2 *Sch. & Lef.,* 474. And with *intent* that it should take effect. *Maloney vs. L'Estrange,* 2 *Beat. Ch. R.,* 413.

4th. The confirmation must *not* have been made in *pursuance* of the original transaction, *Wood vs. Downes,* 18 *Ves.,* 125; nor under the *influence* of that transaction, *Crowe vs. Ballard,* 1 *Ves.,* 215; nor of the *same circumstances* which produced that transaction. *Wood vs. Downes. Roche vs. O'Brien,* 1 *Ball. & Beat.,* 338. *Gowland vs. De Faria,* 17 *Ves.,* 25. Otherwise it will not be a confirmation, but merely a continuation of the original fraud. *Same case, and Lewin on Trusts,* 391, 24 *Law Lib. Dunbar vs. Tredendick,* 2 *Ball. & Beat.,* 317.

5th. The party giving the confirmation must have done so after having full knowledge of his *legal rights,* of his *power* to *disaffirm* the former transactions and to be *relieved therefrom,* on application to a Court of Equity. *Leach, M. R., in Cockerell vs. Cholmeley,* 1 *Russ. & Myl.,* 425. *Hoffman, V. C., Fish & Miller,* 1 *Hoffman's R.,* 280. *Dunbar vs. Tredendick,* 2 *Ball. & Beat.,* 317. *Maloney vs.*

*L'Estrange,* 3 *Beat. Ch. R.,* 413. *Murray vs. Palmer,* 2 *Sch. & Lef.,* 474. *Lord Brougham, Bennett vs. Colley,* 2 *Myl. & Keen.,* 242. *Lord Thurlow, Crowe vs. Ballard,* 1 *Ves. Jr.,* 220. *Boyd vs. Hawkins,* 2 *Dev. Ch.,* 195. *Lewin on Trusts,* 25 *Law Lib.,* 390. *Hill on Trustee,* 525, (marg. pag.) *Story's Eq.,* sec. 345. Notes to *Crowe vs. Ballard,* 1 *Ves. Jr.,* 220. (*Sumner's Edition.*)

6th. The party giving the confirmation must have done so after having *full knowledge* of *all the material facts of the case. Fisk vs. Miller,* 1 *Hoff. R.,* 280. *Farnum vs. Brooks,* 9 *Pick.,* 234. *Maddeford vs. Austwick,* 1 *Sim.,* 89. *Lewin on Trusts,* 27 *Law Lib.,* 390, and cases there cited. *Hill on Trustees,* on "discharge of a breach of trust," 525, 527. *Fox vs. Mackreth, White's Eq. Ca.,* 65 *Law Lib.,* 136. *Murray vs. Palmer,* 2 *Sch. & Lef.,* 474. *Boyd vs. Hawkins,* 2 *Dev. Ch.,* 195. *Leach, M. R.,* in *Cockerell vs. Cholmeley,* 1 *Russ. & Myl.,* 425. *Bell vs. Webb,* 2 *Gill,* 170.

Denying, as the defendants do in their answer, the invalidity of the original transaction, how can they contend that the meeting of stockholders *knew* of that invalidity, or that Sherman disclosed to his *cestui que trust* that invalidity?

No confirmation, however absolutely proved, would be sustained under such a condition of ignorance of fact and of law. *Morse vs. Royald,* 12 *Ves.,* 372. *Hill on Trustees,* 805, top.

III. Whether this meeting was legally competent to ratify and confirm this contract of sale and transportation.

The Act of Incorporation of 1840, ch. 214, requires that at all general meetings for any other business than an election of officers, a quorum for the transaction of business shall be the owners and representatives of at least a major part of the stock of the company, each share being entitled to a vote. The number of shares in this company being 50,000, 25,001 constituted a majority. The only vote taken by shares in the meeting of June 1st, 1857, was

Cumberland Coal & Iron Co. *vs.* Sherman, et al.

on the election for President and Directors, in which 27,997 votes were cast, of which 22,496 were upon powers of attorney, and 5,501 by stockholders who were personally present. The powers of attorney, which are all set out in the record, part II., page 9, &c., are to vote, "at the next election," or "at any election," or "at an election." None of them give authority to vote on any other subject. All the witnesses who have given such powers and were examined, testify that they gave their proxies to vote at the election only; that they did not know any other business was to be transacted, and especially they had no knowledge of the sale to Sherman and Dean. See opinion of New York Supreme Court, by Judge Davies, in *Cumb. C. & I. Co. vs. Sherman & Dean, &c.*, 30 *Barb. Sup. Ct. Rep.*, 576. *Devoe vs. Fanning*, 2 *Johns. Chy. Rep.*, 264. *Ex-parte Lacey*, 6 *Ves.*, 622, 628. *Ex-parte James*, 8 *Ves.*, 337.

*E. W. Stoughton* and *R. Johnson*, for the appellees:

1. Though Sherman, as a director, could not purchase so as to bind absolutely the stockholders, the purchase was not void.

1st. As against all but the stockholders it was valid, and as against them was valid at law, whilst as against him it was valid both in equity and at law, if the stockholders elected so to consider it. See *Richardson vs. Jones*, 3 *Gill & Johns.*, 184. *Bell vs. Wells*, 2 *Gill*, 164. *Forbes vs. Forbes*, 5 *Gill*, 29. *Mason vs. Martin*, 4 *Md. Rep.*, 124.

2. The legal presumption is universally true, that knowledge of the law is to be presumed, and is of itself evidence of the fact of knowledge, so as to cast the *onus* of disproving the fact on the party who asserts actual ignorance. If there be any exception to this rule it is only in cases in which silence or acquiescence is relied upon to work a forfeiture of the estate, and this on the ground that otherwise such silence or acquiescence would operate as a fraud on a third party, and only then when the legal pre-

sumption is of so doubtful a character that ignorance of what the law in regard to it really is, may well be presumed to exist.

1st. At law. *Mayor & C. C. of Baltimore vs. Lefferman*, 4 *Gill*, 425. *Morris vs. The Mayor & C. C. of Baltimore*, 5 *Gill*, 244. *Broome's Maxims*, 62, and notes. *Beck vs. Thompson*, 4 *H. & J.*, 531. 1 *Peter's Supreme Ct. Rep.*, 1. 1 *Story's Eq.*, *from sec.* 113 onwards.

2d. In equity. *Lammot vs. Bowley*, 6 *H. & J.*, 500. *State vs. Reigart*, 1 *Gill*, 29.

In this last case the same judge who gave the opinion in *Lammot vs. Bowley*, and speaking for the whole Court, (for the decision in Gill was unanimous,) says that the right to dispute the presumption of legal knowledge where the facts are known, is only where the law is very doubtful, and not where it is plain and settled. In this instance, *that Sherman being a director, had no right to buy without the assent of the stockholders,* all sides admit was a clear legal principle. It was so expressly stated by this Court, and by the Court of Appeals, in their respective opinions, on the motion to dissolve the injunction, and is supported by all the authorities cited on either side, in the present argument.

It is submitted, therefore, that the presumption of knowledge of that law, not only casts upon the other side the burthen of disproving it in fact, but on the authority of the case in 1 *Gill*, was so conclusive as not to be liable to denial. It being a presumption *de juris et de jure*.

3. The stockholders, when meeting in 1856 and 1857, had a right, and it was their duty, to consider all business affecting the corporation that might be before them. And this, too, it was their uniform custom to do, as is proved by their records of such meetings. Every variety of transaction affecting the interest of the stockholders, the year's business, inclusive of everything, sales of property, disbursements of all kinds, including purchase of property, acceptance of the several supplements to their charter, were all

considered and acted upon at such meetings, and the right to do so, never then or afterwards called into question, much less denied.

1st. At the meeting of 1856 and 1857, many stockholders were represented by proxies. The right to be represented by proxies at such meetings, is given in express terms by the third section of the original charter of 1840, and recognized by the fifth section.

2d. The form of proxies used at the meetings of 1856 and 1857, it is admitted, was the same as was always used before and afterward. It also appears that, at such prior and subsequent meetings, all the business transactions of the company for the year preceding, were considered and decided by persons voting under such form of proxy, and never after questioned. The supplements to the charter were so accepted, and the policy of the company uniformly so determined upon. To hold now, that this form of proxy gave no authority but to vote for President and Directors, would be fatal to the stockholders, and a fraud upon the public. As all the acts of the company, done at their several annual meetings, except the election of President and Directors, are now, for want of authority, absolutely void.

3d. But admitting that the proxy, considered by itself, did not authorize the voting on any other matter than the election of President and Directors; yet, it is submitted as perfectly clear, that considered in connection with the admitted uniform custom, to vote them on all the business of such meetings, the Court is bound to presume, in the absence of all evidence to the contrary, that the proxy was intended by the stockholders, who gave it, to confer such general authority. It is a mistake to suppose that a proxy under such a character as that of the complainants, can only be created by writing. Proxy means merely representation. And representation may be constituted by parole as well as by writing. A stockholder would not be permitted, after authorizing his agent to represent him at such meeting, and knowing that he had so represented

him, and acquiescing in it, afterward to repudiate the authority. Corporate acts, of every kind, whether contracts or anything else that the charter authorizes, may be done and proved by the same kind of evidence, that is sufficient to prove similar acts between individuals. See *Dandrige vs. The Bank of the United States*, 12 *Wheat.*, 64. *Union Bank vs. Ridgley*, 1 *H. & G.*, 324. *Angel & Ames on Corp.*, sec. 173.

As Mr. Justice Story says in 12 *Wheaton:* All that is required is the proof of the fact in dispute, and not a particular mode of proof. If the charter prescribes no particular mode, the fact may be proved by such evidence as is admissible between individual litigants. To the same point see the cases of *Glenn vs. Grover*, 3 *Md. Rep.*, 228. *Edelin vs. Saunders*, 8 *Md. Rep.*, 130.

4th. But, finally, on this point, it is confidently maintained, that the true meaning of the proxy, construed by itself, is that the holder is to represent the stockholder at the meeting, in every matter that may be legally brought before the meeting. It gives authority to vote at the election of President and Directors; that is, at the meeting when such election is to take place; and as the stockholder knew that at such meeting the annual report would be presented, and the policy proposed, adopted or rejected, the stockholder must have intended the authority of the proxy to embrace these matters as well as the election. And, above all, conceding the preceding observation not to be conclusive, it is thought to be free of all doubt, that when, as is admitted, the notices of the meetings uniformly stated that "any other business" was to be transacted than the election of President and Directors, the legal conclusion is imperative, that the proxy was intended to authorize the holder to represent the stockholder in every matter that might be legally presented to the meeting.

5th. The idea that each stockholder must have joined in the consideration of the contract and purchase in dispute, and himself have sanctioned it, in order to bind him, is

wholly untenable. In cases of corporations, the decision of a majority, on all corporate matters, is binding upon the minority. See *Angel & Ames on Corp.*, sec. 499, and cases there cited. *Grant on Corp.*, 68, 263, 272.

The opinion of Judge Davies, relied upon by our opponents, on this point, only intimates a doubt upon the question, and even that doubt has no warrant whatever in the cases to which he refers. They will be found, all of them, to be cases of creditors, each of whom, of course, acts in his own right, and not of stockholders in a chartered corporation, who, having a joint interest, must be bound in relation to it by the decision of a majority. *Angel & Ames on Corp.*, sec. 499, &c.

4. It is submitted, that the consideration for the purchase in dispute in the case is, by the proof, shown to be adequate; but conceding, for the sake of argument, that such is not the effect of the proof, inadequacy of consideration is never, of itself, a sufficient ground for equitable relief, nor is it ever resorted to in a Court of Equity, except to prove fraud in fact; and it is never used for that purpose except where it is so grossly inadequate as to be proof of fraud in fact. See 15 *Howard Sup. Ct. Rep.*, 42, 59, 60. *Coles vs. Trecothick*, 9 *Vesey*, 244 to 248. *Burrowes vs. Lock*, 10 *Vesey*, 474. *Lowther vs. Lowther*, 13 *Vesey*, 108.

Bowie, C. J., delivered the opinion of this Court:

The most prominent and material features of this case, have been elaborately argued and deliberately considered, in the decision of the case of *The Hoffman Steam Coal Company of Allegany County, vs. The Cumberland Coal & Iron Company*, tried before this Court at June term 1860. A synopsis of the pleadings and points then presented, and the opinions of the Court, will be found in 16 *Md. Rep.*, 456. The parties are the same, but their position is now reversed. The former appeal was taken by the present appellees from the order of the Judge of the Circuit Court for Allegany County, passed after answers filed and testimony

taken by the parties, under the Act of 1835, refusing to dissolve and continuing the injunction before granted by him. This Court affirmed the orders of the Court below, and continued the injunction until final hearing.

The cause being remanded for further proceedings, commissions were issued, further testimony taken, and on final hearing, the same learned judge who granted and continued the injunction, dissolved the same and dismissed the bill. From which decree the present appeal is taken.

The cause being heard originally on testimony taken under the Act of 1835, a large proportion of the evidence now in the record has already been reviewed and considered by our predecessors. It devolves upon us to determine how far the former testimony has been qualified by the latter, whether there is such a material change in the aspect of the case, as to oblige us to depart from the decision previously pronounced.

The law, as applied to the facts there developed, is expounded with great force in the opinion of our late brother, the Chief Justice. Much of the labor which the magnitude of the interests and record seemed to impose, has already been performed; our duty being to observe that cardinal maxim of justice and jurisprudence, that the Court should adhere to its own decisions in the same cause and between the same parties. "Where, upon appeal, the Appellate Court decides a question presented by the record, and the cause is remanded, the decision is binding both upon the Court below and the Appellate Court, and cannot be reversed upon a second appeal." *Emory & Garret vs. Owings, et al.,* 3 *Md. Rep.,* 178. *Preston vs. Leighton,* 6 *Md. Rep.,* 88. *Hammond's Lessee vs. Inloes,* 4 *Md. Rep.,* 138. *Eyler & Matthews vs. Hoover, Ex'r of Crabbs,* 8 *Md. Rep.,* 1. *Mong vs. Bell,* 7 *Gill,* 246. *Brown vs. Sumerville,* 8 *Md. Rep.,* 444.

"All that is necessary to render the decision binding, is to show there was an application of the judicial mind to the precise question adjudged." *Alexander vs. Worthington,* 5 *Md. Rep.,* 471.

The eminent counsel who represent the appellees in this cause, admit "the rule of law which precludes a trustee from purchasing from himself, is based upon sound principles and an enlarged public policy."

The reason of the rule, they insist, should not however be lost sight of: "A trustee may, under certain conditions, purchase from his *'cestui que trust.'* " The transaction must be for a consideration adequate, and the *"cestui que trust"* must have full knowledge of all material circumstances, that he may be able to judge of the propriety of the transaction. The trustee must conceal nothing which may assist in forming the judgment. When, however, the trustee purchases from himself, the *"cestui que trust"* may, irrespective of the fairness of the transaction, rescind, if he elects to do so, within a reasonable time. They insist, "it should be borne in mind, however, that the rule of law here referred to, grew out of transactions quite different from the one before the Court." Nevertheless while the mischiefs which the rule referred to, was intended to present, could rarely, if ever, grow out of a transaction like this, it was conceded for the purpose of this argument, that the rule invoked, applies. They contend, that the rights of rescision is in the stockholders, and not in the directors of the appellants; that the stockholders ratified the transaction, with full knowledge of the law and the facts. They assert, that the right to rescind, implies the duty of restoring or refunding the purchase money paid, and other moneys received under the contract, which has not been done, or offered to be done in this case.

In response to this latter and minor objection, the appellants allege there was nothing received by them which should have been refunded; that the assets of the company, of which Sherman was a director, were appropriated by him, to make the payments received, and that he is still in arrear to the appellants, for money had and received to their use. The matters of account between the appellants and appellee, are so numerous, intricate and involved, that

it is impossible for this Court to decide, what amount of assets, belonging to the former, were in the hands of the latter, at the date of the supposed payments, without the adjustment of the accounts by an audit. If the allegations of the appellants be true, there was nothing actually received by them. Equity would not under such circumstances require an offer to refund, as a condition precedent to the right or act of rescision. It is no objection to the form of the bill that such an offer is not made under the circumstances of this case. The necessity or propriety of a tender, or offer to refund, depending entirely upon the existence of the facts, of *bona fide* payments. If that fact should appear from an audit of the accounts, it would be ground for the Court to require repayment of the amount advanced, before the execution of a reconveyance, but it is not so controlling as to suspend the power of this Court, in granting the more partial relief by injunction.

Both the tribunals, who have previously considered this case, concur in considering the appellee, The Hoffman Steam Coal Company of Allegany County, as standing in the shoes of Sherman and Dean, and equally affected with notice. No change, that we are aware of, has been wrought by the new testimony, in this aspect of it. The allegations of the bill and answers, the evidence, admissions and arguments of counsel, as well as the opinion of the Courts, all indicate, that the main question to be decided on this appeal is, whether the sale to Sherman and Dean has been ratified by the stockholders, under the circumstances prescribed by this Court in its former opinion. The law announced on the former trial of this case, by the Court of Appeals, to which we are bound to conform, not less by its intrinsic merit than the weight of authority and precedent, is as follows:

"In this State, as elsewhere, it is well settled, that trustees cannot purchase at their own sales, either directly or indirectly, and if they do, such purchase will be set aside on the proper and reasonable application of the parties in-

terested." *Richardson vs. Jones*, 3 *G. & J.*, 184. "This doctrine which is applicable to trustees, applies also to purchases, by persons acting in any fiduciary capacity, which imposes upon them the obligation of obtaining the best terms for the vendor, or which has enabled them to acquire a knowledge of the property.' The authorities, supporting it, are numerous and uncontradictory. They will be found brought together to a considerable number in the notes to the case of *Fox vs. McRotte*, 1 *White & Tudor, Leading Ca. in Eq.*, 105. A director in a company holds such a relation to its stockholders. After citing and quoting with approbation the decision of the *Aberdeen Railway Co. vs. Blaikie*, 1 *McQueen Repts.*, 461, and *Michoud vs. Girod*, 4 *Howard*, 503, this court proceeds: 'These citations are sufficient to show, that the dealings of the defendant Sherman, with the property of the complainants, fall directly within the prohibition of the rule, and as a consequence are obnoxious to disavowal.' 'But, it is said, however this may be, the whole transaction was fully ratified and confirmed by the complainants, which ratification and confirmation, relieved it from all legal infirmity.' An attentive consideration of its whole history, as detailed in the record, has not brought us to this opinion. The law governing questions of ratification like the present, is well settled. To render the act of ratification effective and conclusive, certain considerations are necessary. At the time of the supposed ratification, the principal must have been fully aware of every material circumstance of the transaction, the real value of the subject of the contract, and this act of ratification must have been an independent and substantive act, founded on complete information and of perfect freedom of volition.

"And in addition to all this, the *cestui que trust*, must not only have been acquainted with the facts, but apprised of the law, how those facts would be dealt with if brought before a Court of Equity. *Lewin on Trusts*, (Ed. of 1858,) 615.

"This last requisite it is nowhere shown in the proof, has been complied with; but, on the contrary, it is fairly to be inferred, that the stockholders believed they were concluded by what had been done, and this inference is particularly strengthened by the circumstances that the modification in the contract of transportation, was solicited and granted not as a matter of right, but as a concession on the part of the beneficiaries under it. In this view, it is not necessary we should dwell more fully on the other facts attending the negotiation and sale. Such commentary properly belong to the final hearing."

To bring themselves within the conditions prescribed by the preceding paragraphs of this Court's opinion, on the former appeal, has been the object and effort of the appellees, since the cause was remanded for final hearing.

The sale to Sherman and Dean being subject to disavowal, in consequence of the admitted relation of the former to the vendors, and the sub-purchasers being held affected by notice, actual or constructive, independent substantive ratification and confirmation by the stockholders, with full knowledge of every material circumstance of the transaction—the real value of the subject of the contract—complete information of the facts, and the law in a Court of Equity as operating on such facts, and perfect freedom of volition, were held essential to make it valid.

All the testimony and argument, not relative to some one of these particulars, is therefore immaterial to our present inquiry. The learned judge who decided this case below, upon final hearing, says in his opinion:

"Upon the former hearing I decided, (and as before stated it was confirmed by the Court of Appeals,) that there was no sufficient evidence of such a ratification. But since that time, a large mass of testimony has been taken by the defendants on this point, and no opposing testimony whatever, is presented on behalf of the complainant.

"The case now coming up before me for final hearing, upon all the testimony, and the Court of Appeals having

settled the law and stated the conditions as to this question of ratification, I proceed to examine *whether this sale was ratified* in accordance with those conditions.

"The first of these conditions, as stated by the Court of Appeals in the language before quoted is, 'whether the principal was fully aware of every material circumstance of the transaction, and the real value of the subject of the contract.'   The evidence upon this point, as now disclosed, is all upon one side.   The record of the proceedings of the meeting of stockholders of complainants, held on the 1st of June 1857, (being complainant's own record) shows, that immediately after the meeting was organized, at the request of Seth Grosvenor, Esqr., the Secretary read the report of the year ending June 1st, 1856, together with the deed of conveyance and contract of land sold, with the proceedings of stockholders and Board of Directors appertaining thereto, which was fully discussed and satisfactorily explained.   These are the words of the complainants own record.   And I may here inquire, judging from this language alone and unexplained, *what* was read and *what* was the knowledge here communicated?   It certainly imports that the minutes of the stockholder's meeting (initiating the proceedings which led to the sale) of June 1855, were read; that the proceedings of the directors at their meetings in October, December, January and May 1856, authorizing and confirming the sale, were also read; that the report of the President to the stockholders in June 1856, notifying them of the sale and of the entire consideration to be paid, was also read; that the deed and the contract of transportation (copies of which were preserved amongst the archives of the company for future reference) were also read; that discussion thereupon took place as to the propriety and fairness of said deed and contract, and that the entire subject was fully discussed and satisfactorily explained.

"It is true that the latter part of the proceedings of the same meeting if unexplained might be ambiguous.   But a

vast amount of testimony has been taken since the former hearing, by which it is shown conclusively, that the whole subject of this deed and contract was the *first* matter that engaged the attention of the stockholders at that meeting in June 1857, and that after the entire proceedings and the deed and contract had been read, discussed and fully considered, it was unanimously agreed to confirm and ratify the same. (See testimony of Beadle, Hinman, Loomis and Mchaffey.) And the subsequent proceedings in reference to the release, are shown to have taken place just previous to the close of the meeting, and after the entire subject had been previously disposed of by a full and unequivocal ratification. (See testimony of Hinman, Beadle, Pettit, Mehaffey and Loomis.")

In this copious extract, the learned judge has put the evidence in support of the fact of ratification, as forcibly and fully as the counsel of the appellees could have desired, and as it is, obviously, partly directed to the argument of the Court of Appeals, at the first hearing, on the absence of proof of knowledge on behalf of the stockholders of their right to disaffirm, we have chosen to express the learned judge's opinion, in his own language.

It was well asked, by the learned judge below, what was read, and what was the knowledge communicated? The documents referred to as read, and as the medium of the knowledge communicated to the stockholders, and the record showing all "which was fully discussed and satisfactorily explained"—after which a release was offered by Sherman and accepted by the stockholders, discharging the company from certain obligations imposed by the contract of transportation,—were all before the Circuit Court, and this Court, at the former hearing. Notwithstanding which, both tribunals arrived at the conclusion that there was then no sufficient evidence of ratification, with full knowledge of the law and the facts. The Circuit judge having *now* reached a different result on the final hearing, the conclusion is, that something new was elicited by the

18    v. 20.

great mass of testimony, in relation to the ratification or confirmation by the stockholders, which was not laid before the Court before.

Upon an analysis of that testimony, it is believed it will be found, that the only difference in the *status* of the case, then and now is, that at the former hearing, the defendants relied on circumstantial evidence of an implied ratification, and at the final hearing, on positive proof of an express ratification.

The fact of ratification, implied or express, was insisted on by the appellees, on each occasion. The Courts continued the injunction, upon the ground that, there was not sufficient proof of a valid ratification, implied or express. At the final hearing, the injunction was dissolved, on the hypothesis, that a valid ratification had been proved. The additional testimony, on the subject of ratification, is mainly, if not exclusively, as *to the mode of ratification, i. e.* the adoption of a resolution verbally on motion, that the sale to Sherman and Dean be confirmed and ratified.

No additional testimony is offered of the character of the explanations, or the nature of the information given to the stockholders, prior to the ratification; the single additional fact, proved on this point is, that a verbal motion was made and seconded, that the sale to Sherman and Dean be confirmed and ratified, which was done. In his opinion on the motion to dissolve in the Circuit Court, the learned judge said: "I have seen no fact or circumstance in this case, which authorises me to determine that the stockholders, those whose interests and rights are materially affected, (indeed the only person injured) have been made acquainted with the nature and extent of the contract and sale in this cause. And the rule being 'that they must be aware that the transaction is of such a character that they could impeach it in a Court of Equity,' I repeat, I cannot see in the case, the least evidence to establish such a knowledge." (Opinion of Judge Perry, p. 297, Recd.)

The Court of Appeals, referring to the same argument

of the appellees, that the sale had been ratified, said: "An attentive consideration of its whole history as detailed in the record, has not brought us to this opinion. The law governing questions of ratification, in cases like the present, is well settled. To render the act of ratification effective and conclusive, certain considerations are necessary. At the time of the supposed ratification, the principal must have been fully aware of every material circumstance of the transaction, the real value of the subject of the contract and his act of ratification must have been an independent and substantive act founded on complete information and of perfect freedom of volition. And in addition to all this, the *cestui que trust* must not only have been acquained with the facts, but apprised of the law, how those facts would be dealt with if brought before a Court of Equity. This last requisite it is nowwhere shown in the proof, has been complied with."

Thus it appears, in the judgment of both tribunals, that the appellees had failed on the motion to dissolve, to show a ratification by the stockholders with knowledge of the facts and the law. If so, what additional proof of knowledge of facts and of law, is conveyed by the evidence, that a verbal motion to ratify and confirm, was made and adopted; after which, a committee was appointed to receive a release offered by Sherman.

The testimony at the first hearing, represented the release as obtained, as a matter of favor, after a declaration by Grosvenor, that they no longer had any claims on Sherman and Dean. Commenting on which, this Court said: "It is fairly to be inferred, that the stockholders believed they were concluded by what had been done, and this inference is particularly strengthened by the circumstance, that the modification in the contract of transportation was solicited and granted, not as a matter of right, but as a concession on the part of the beneficiary under it."

To repel this presumption, the appellees proved that it was *after* a vote of ratification and confirmation had been

passed, and other business intervened, that the subject of the release was introduced and its acceptance determined. The learned judge below says: "And although as stated by the Court of Appeals, it was a fair inference from the proceedings of the stockholders in reference to the release or modification of the transportation contract, that the parties believed they were concluded by what had been done, as that modification was granted not as matter of right, but as a concession on the part of Sherman and Dean; yet as these proceedings are *now* explained by the testimony since taken, no such inference can now be drawn." We cannot concur in this deduction, for reasons which will be assigned, in the progress of our view of this testimony.

To recur to the questions, what was read, and what was the knowledge communicated? Passing over the initiatory proceedings, the report to the stockholders of June 3rd, 1856, was read; which after reciting the resolution, adopted at the annual meeting of 1855, authorising the President and Directors to "sell such portion of the property of the company as they may deem advisable, and to institute and carry into effect such other measures as they may think proper *for the interests of the company*," communicated as follows: "In pursuance of and by the advice of the Board of Directors, I have negotiated and completed a sale of *a portion of the unworked lands of the company for the sum of* ($140,000.) A larger sale was contemplated, but our chief object, *the development of our property, encouraging and directing enterprise to the most accessible portion of the coal field,* and *furnishing additional transportation for our own railroad,* was accomplished *by this limited sale of a few hundred acres.* Other considerations than price induced me to affect this sale, for in addition to the price received for the lands, the revenue from our railroads will be enhanced equal to $500 per acre for every acre sold *from profits of transportation alone,* coal necessarily passing over the company's road, and that destined for

Cumberland Coal & Iron Co. *vs.* Sherman, et al.

the canal, being shipped from its wharves at Cumberland. * * * * * The extinguishment of the bonded debt has been a leading feature in the policy pursued by all the boards of directors since the organization of the company. * * * * I therefore have appropriated a portion of the proceeds of sale to the further extinguishment of the bonds to the amount of $112.000.''

It is said the deed and transportation contract were read at the same time. These being conched in technical terms, conveyed no precise information to the hearers. Their import and effect were interpreted through the annual report of the President, just read in the presence of Sherman to the stockholders, according to which, in addition to the price received, the revenue from the tolls of the company would be enhanced $500 per acre from profits of transportation alone.

They are assured that $355,000 is now the entire debt of the company, that they are possessed of more than one-half of the entire "Great Vein" of Allegany County, as yet comparatively undeveloped, and facilities for mining and transporting 250,000 tons with an increase in the same ratio each succeeding year. The report conveys no information of the terms of the contract or the obligations assumed by the Cumberland Coal and Iron Company for the transportion of coal. There is no reference in it to deeds, contracts or maps.

The Hoffman mine is not mentioned except incidentally thus: "This sale renders it *expedient* to extend to the Hoffman mine, the company's road, which it is expected will be completed in all this month, and I would earnestly recommend its further extension to the justly celebrated 'Astor Mine,' which has at great cost been thoroughly developed and equipped" The Hoffman mine was then sold! what was spoken of as expedient, the President had covenanted the company should do under a penalty of $100, for every twelve hours continued refusal or neglect, yet it was spoken of as a matter of choice, not of obligation, upon the same footing with the Astor mine.

Relying on the official exposition of the President, of the 2nd June 1856, read at the annual meeting of 1857, the stockholders had reason to regard the sale of the lands described as "a portion of the unworked lands," and "this limited sale of a few hundred acres," as an arrangement infinitely advantageous to them, involving no material part of their own resources, nor affecting in any manner injudiciously their franchises, privileges or property.

With such prospects, the stockholders might well be indifferent to the sale of "a portion of the unworked lands of the company." After this representation of the facts by official documents *and explanations from the President,* the testimony of Petit, Loomis, Beadle, Baker, Hinman and Mehaffey, is relied upon by the appellees, to prove the fact of a formal act of confirmation and ratification by the stockholders, after full inquiry and discussion, on the 1st June 1857. Messrs. Mehaffey and Petit give the fullest accounts of what transpired at the annual meeting. In reply to the 60th interrogatory-in-chief, record p. 453: "State what was first done upon the organization of that meeting, what business was first transacted." Mehaffey answered: "The first business done was a call by Mr. Seth Grosvenor for the reading of the report of 1856, of the President, of the affairs of the company. The report was read by the Secretary, and referred to a deed of the sale of the land to Sherman and Dean. That deed was then called for, I think, with a contract, and both were read by request of Mr. Grosvenor, and discussed and disposed of before the regular business, for the report of the year just closed, was called up." (The President's report for the year ending 2nd June 1856, containing no reference to the deed above mentioned, in this Mr. Mehaffey was entirely mistaken.)

61st Int. "Upon the conclusion of the reading of the deed and transportation contract, you say the matter was discussed. State the substance of what was said by the stockholders on that occasion, and who participated in the discussion."

Answer. "Mr. Grosvenor, who seemed to be at the head of a party, came in under some rumors in the street, in relation to a sale of a portion of the company's property, and wished to know what were the facts in regard to it. After the hearing the report, the deed and contract read, he frankly, for the first time, stated that he had heard vague rumors without specifying them, and that his object in calling for the papers was to be informed of the facts. And he expressed himself, after an interchange of views in regard to the matter, (there was quite a large number there,) exceedingly gratified that he had taken the course he had taken, and which was suggested to him by several of his friends then present. He said, he was the more gratified, because he found the rumors referred to had their foundation in Wall street, perhaps for the purpose of stock operations, and that he saw nothing there but what was right and proper. Dr. Beadle, Mr. Hinman and some others took part in the discussion and expressed themselves as entirely satisfied, and that the whole matter was satisfactory to them. Mr. Grosvenor seemed to be the spokesman of the party, and said nearly all that was to say about it. The question was asked by several of the stockholders present, as to the quantity of land owned by the company, the effect of this sale, *as to its advantages in reducing the bonded indebtedness,* all with a view to form an opinion as to the propriety of the sale; and it was after such inquiries and interchange of views that they expressed themselves without a dissenting voice as to the propriety of the sale."

62nd Int. "What did they say when they thus expressed themselves, and who said it?"

Answer. "Well, *they all said it, that the whole transaction was proper, and that the rumors were false and an attempt to depreciate the stock of the company.*"

63d Int. "After thus expressing themselves and before proceeding to any other business of the meeting, was any motion made or resolution offered, and if yea, what, and by whom? State particularly."

Answer. "A motion was made, but I can't recollect by whom; my recollection is, however, that either Mr. Grosvenor or Mr. Hinman made the motion. I think it was the former. They were the persons who took an active part in the matter, and came in for the purpose. The motion was in approbation of the deed and contract, the report, and all that had been brought before them."

64th Int. "When this motion was so made, what was done or said at that meeting?"

Answer. "Simply voting on the motion; there was nothing said. It was an universal response in favor of the motion, which was adopted."

65th Int. "Was that motion reduced to writing, or the action of the meeting upon it?"

Answer. "I have no recollection whether it was or not."

96th Int. "Was it customary at the annual meetings of stockholders to submit motions, resolutions, without reducing them to writing?"

Answer. "It was frequently done."

67th Int. "What was done or said at that meeting, after the adoption of that motion or resolution?"

Answer. "Mr. Grosvenor then left his seat, extending his hand to me and apologised for thus interrupting the regular business of the meeting, but said that he did it under a sense of duty, and was glad he had done so, and said, I am a large stockholder, and I now feel better and I hope you do too. I accepted the apology and told him that I was equally rejoiced at what he had done. He then requested, if in order, that I would read the report of the year just closed, which was done, and that report was also adopted without a dissenting voice. Immediately before or after the formal adjournment of the meeting, one of the gentlemen, I think it was Dr. Beadel, called for the contract, which had been already read and adopted, and he called my attention and Mr. Grosvenor's, and one or two others, to a clause in it, requiring the company to carry coal for Sherman and Dean for the period of twenty

years, which it occurred to him on reflection, might become onerous to or an impossibility on the part of the company, in the event (as near as I can recollect the words) of an earthquake or the road being carried away by a freshet, and he suggested, if Sherman and Dean would assent to it, some reservation, relieving the company in such contingency, or inability, should be made. *I observed that as far as I was concerned,* I would assent to it at once, and I called Judge Sherman's attention to it, Mr. Grosvenor, Mr. Hinman, Dr. Beadel and others, and Judge Sherman, conferred together among themselves, which resulted in the appointment of a committee to whom that matter was referred."

68th Int. "What was said by Judge Sherman, if any thing, at the time it was proposed such reservation or change should be made in the contract?"

Answer. "I recollect now that Mr. Grosvenor approached Judge Sherman and observed, *that they had now no legal right to ask any change or alteration* but if he would assent to it, they would be gratified; Judge Sherman said at once that he had no objection."

Mr. Petit's account (Rec'd p. 523,) of what occurred at the annual meeting of stockholders, June 1857, and the order in which it occurred, is this:

"The President called the meeting to order, and arose to read his report. He was interrupted by Mr. Grosvenor, who called for the reading of the report of the previous year, which was read. Mr. Grosvenor then called for all the papers referred to, in connection with the sale of lands to Sherman and Dean, referred to in the report. The deed and contract were then read by the Secretary and discussed. Information was elicited by various stockholders, *explained chiefly by the President,* and after full and free discussion, Mr. Grosvenor expressed himself satisfied. It was then moved by Mr. Grosvenor and seconded by Mr. Hinman, that we now proceed to ratify the sale; which motion was put by the President, and unanimously carri-

19     v. 20.

146 MARYLAND REPORTS.

Cumberland Coal & Iron Co. vs. Sherman, et al.

ed. The President then read his report for the year ending at that time, which was adopted unanimously, on motion, and ordered to be printed.

"The meeting proceeded to the election of Directors, tellers were appointed, and the polls were kept open until half-past two, P. M. During the interval between the opening and closing of the polls, much was said and much information elicited in relation to the company's interest. Some one called or asked for the reading again of the contract between the 'Company and Sherman and Dean' which was read. Dr. Beadel, or some one else, expressed himself that he would be better satisfied, if some modification were in that contract, or deed and contract, in reference to the obligations of the company, to carry coal, to make sidings, I think, under certain circumstances as contained in the agreement or contract, or deed and contract.

"Mr. Grosvenor remarked that, 'we now have no legal claims on Sherman and Dean,' but on Sherman saying that he was perfectly willing to make such modifications or to give up the property, by the amount of money he had paid on it being refunded, it was on motion of Dr. Beadle resolved, that a committee of stockholders numbering I think three, be appointed to act in connection with Sherman in making such release or modification, and that the Board of Directors receive the same."

At the risk of prolixity, we have quoted literally, the evidence of two witnesses of the appellees who give the most particular and detailed accounts of the action of the stockholders, at their annual meeting of June 1857. Referring to the resolution of ratification, and the subsequent release or modification of the transportation contract, Messrs. Loomis, Baker, Beadle and Hinman, depose to the facts of confirmation and release more briefly, but substantially to the same effect. It is apparent from the evidence cited, the great solicitude of Grosvenor and the party he represented, was to ascertain the effect of the sale on the stock of the company; he was a large stockholder, had heard ru-

Cumberland Coal & Iron Co. *vs.* Sherman, et al.

mors on the street, to the injury of the stock, and came to the meeting to inquire into the cause of these rumors. He required the report of June 1856, to be read, which according to the minutes of the company, had been adopted, printed and published a year before for circulation among the stockholders, and which it is to be presumed he had already in his possession. He called for the deed and the contract, these likewise were on file in the office of the company and alike accessible to him. There was an interchange of views in regard to the matter. "Information was elicited by various stockholders, explained chiefly by the President, and after full and free discussion, Mr. Grosvenor expressed himself satisfied." *What the explanations of the President were, we are left to infer.* There can be no doubt, they were in strict conformity with the annual report of 1856, which had just been read and was under discussion, and that of 1857, which was waiting to be read and ratified. The President, was the chief speaker. His management of the affairs of the company was under consideration. His re-election was depending on the result. *Immediately after these explanations, on motion of Grosvenor,* the sale and contract to Sherman and Dean were ratified and confirmed, and the annual report for the year 1857, was unanimously adopted. The stockholders then proceeded to elect officers for the ensuing year. As a natural consequence of what had transpired, Mehaffey was re-elected President, and Sherman, Torrey, Petit, Baker, Hinman and others, Directors, each receiving 27,997 votes; all those connected with the sale, either advising, participating or sustaining it, being continued in the direction. It is not only important, in investigating the circumstances of the confirmation of the sale, to enquire what information was given, but who were informed. The record shows that 22,496 shares of stock held by fifty-eight stockholders were voted by proxy at the annual meeting of June 1857, by four persons. Vide Rec'd pp. 2, 11 and 12.

Cumberland Coal & Iron Co. *vs.* Sherman, et al.

| 28 stockholders owning | 15,628 | were repstd. | by Torrey, |
|---|---|---|---|
| 23 " " | 3,268 | " " | " Mehaffey, |
| 6 " " | 2,800 | " " | " O'Brien, |
| 1 " " | 700 | " " | " Sherman. |
| 58 | 22,496 | | |

Nearly three-fourths of the whole number of votes cast for the officers elected, were held by themselves.

If fifty-nine stockholders, owning twenty-two thousand shares of stock, were represented· by four persons, two of whom were directors and members of the committee recommending the sale of the lands, and a third the President of the company who made the sale; how many may be supposed to have held the remaining five or six thousand shares which voted at the election of President and Directors?

The President and Directors in effect, represented the stockholders, at the annual meeting; reported nominally to the stockholders, but actually to themselves; ratified in the name and character of stockholders, their own acts as directors, and afterwards, re-elected themselves. In such a system of close corporations, it cannot be supposed there was any development of facts, contrary to the tenor of the official reports, printed and circulated for the information of stockholders, and which we have seen abounded in sanguine expressions of anticipated profits, calculated to inspire the utmost confidence in the wisdom and management of the President and Directors. The resolution of ratification, was therefore not passed upon any additional information other than that contained in the official reports. It did not spring from any desire to confirm what they knew they had the power to·annul, but was an expression of the satisfaction of those then present, with the explanations made by the President. It was to silence the rumors in Wall street, and give tone to the stock. The shareholders acted under the delusions of the original report when voting to confirm. After which, when some one

expressed himself, that he would be better satisfied if some modification were made in the contract, Mr. Grosvenor remarked, "we now have no legal claims on Sherman and Dean," &c.

"This modification (says the learned judge below,) was solicited and granted at the close of the meeting, *after the sale had been ratified*, and when it had become *a matter for concession on the part of Sherman and Dean.*"

Under the impression that the contract was valid and binding upon them, although the motion to confirm had not been reduced to writing or recorded; although the shareholders were still in session, and competent to alter or change any resolve or motion they had adopted; whilst the whole subject was still under their control, they, discovering objections in the contract, instead of rescinding it, appoint a committee to act in connection with Sherman in making a release or modification. Whilst matters were "*in fieri,*" they received as a concession, what they might have totally annulled. What stronger evidence can be furnished of ignorance of their rights, than this action of the stockholders? Can it be supposed that men who imagined themselves legally bound by a verbal vote not registered or recorded, or if registered, that the same was irrevocable at the same meeting, comprehended the relations between trustees and *cestui que trusts* and the obligations imposed by technically drawn covenants and deeds? The session of (2d June 1857) the stockholders, was in legal contemplation a unit, during which the act of ratification was subject to modification or rescission. The release was accepted in acknowledged ignorance of their right to rescind after the verbal vote to confirm had been passed. That modification was a virtual rescission of what had been passed antecedently, but being made in ignorance of their rights, instead of operating as a *quasi* confirmation, is evidence of such "*crassa ignorantia*" as annuls the whole. Confirmation according to the books, must be a solemn and deliberate act, not fished out from loose expressions in a

letter; and particularly where the original transaction was infected with fraud, the confirmation of it is so inconsistent with justice and so likely to be accompanied with imposition, that the Court will watch it with the utmost strictness, and not allow it to stand but on the clearest evidence. *Morse vs. Royal,* 12 *Ves.*, cited in *Lewin on Trusts.* Without dwelling on the omission to ratify the sale at the first annual meeting after it transpired, it is obvious that in this instance, it seemed rather *an accident* than a deliberate act. It was entirely incidental to the inquiry instituted by Grosvenor with regard to the effect of the sale upon the price of the stock; having his fears on that subject removed, as an expression of his satisfaction, or to give steadiness to the stock (and perhaps to allay any prejudice he might have created toward the President and Directors) he moved the sale be ratified and confirmed; but so immaterial was it considered, that the motion was not reduced to writing and not entered on the minutes; this is the more remarkable, when it is in proof, that a part of the minutes relating to this subject were made up by Mr. Sherman, a purchaser and director. Such verbal acts, on the part of a corporation, do not argue more deliberation, if as much, as the loose expressions in a letter of an individual. In the latter instance, the expressions however vague, are subject to inspection, examination and construction; in the former, they depend entirely on the shifting sands of memory, and assume any shape or meaning the mind of the witness impresses on them.

The "*cestui que trusts,*" as a class, had no notice, that the acts of their agents, performed twelve or fifteen months before, were to be subjects of consideration, for rejection or confirmation. To hold them to what was so informally done, by their proxies, without note, memorandum, or resolution upon the minutes of the corporation, would be to extend to the most dangerous proportions, the doctrine that corporations may be bound by acts "*in pais*" of either stockholders or directors, whether evidenced by writing or

not. It is almost a solecism to say that a corporate act of ratification or adoption can exist, without any "outward and visible sign" of such act. Having thus reviewed the question of knowledge of the facts on the part of the stockholders, at the date of the supposed act of confirmation, we will briefly refer to the other propositions, viz:

"The *cestui que trusts* must not only have been acquainted with the facts, but apprised of the law, how those facts would be dealt with if brought before a Court of Equity."

When this proposition was announced, the Courts were not ignorant of the common law maxim: *"ignorantia facti excusat, ignorantia juris non excusat,"* but speaking of the conditions, required by a Court of Equity, to bind the consciences of suitors, who sought relief, or of respondents, who relied upon equitable defences in Courts of Equity, they limited the effect of acts of confirmation or ratification to cases of actual knowledge, that the transaction was of such a character, that the party confirming it could impeach it, in a Court of Equity, and imposed the burden of proof of such knowledge on the party relying on the ratification.

Confirmation and ratification imply, to legal minds, knowledge of a defect in the act to be confirmed and of the right to reject or to ratify it. To say a person or corporation shall be proved to have this knowledge, is only to say that all that is implied by law in the act of ratification, must be fully proved, and is not to be presumed without proof in equity. The exceptions to or modifications of the maxim *"ignorantia legis excusat neminem,"* in equity, were not adverted to in the case of *Stevenson vs. Reigart;* the general principle was incidently referred to, in connection with the facts of that case, which was a case at law. The series of decisions qualifying the maxim in cases where confirmation or ratification of an act, by a *"cestui que trust,"* is relied on in equity, is too well established to be questioned by an *"obiter dictum."* In that case, the principle of *Lammott vs. Bowley* was acknowledg-

ed, but held to be inapplicable. If a party will be relieved in equity, and is not estopped from asserting his title to property, although under a clear and unequivocal mistake of his legal rights, (where such rights are of a doubtful character,) he stood by and saw it sold and acquiesced for some time in such sale, as was held in that case, should *"cestui que trusts"* who did not contract or stand by, be concluded by constructive knowledge of the law, in regard to a sale, made by a trustee to himself, upon the presumption that the *"cestui que trusts"* were cognizant of their rights and meant to release them by a verbal vote ratifying such a sale, under the circumstances of this case? In *Lammott vs. Bowley*, which was an application for an injunction against proceedings at law, on the ground that the defendant was aware of the facts and the law and had slept on his rights, the qualifications of the maxim *"ignorantia legis excusat neminem,"* and its application, were considered and discussed. The result of the review of the authorities was that some of the most enlightened and celebrated men whose characters are recorded in judicial history, have given their sanction to the doctrine "that no man, acting under a plain and acknowledged mistake of his legal rights, shall forfeit those rights in consequnce of such misapprehension." *Lammott vs. Bowley*, 6 *H. & J.*, 526.

"The doctrine of a Court of Chancery is not, as has been contended, that equity will not administer relief (in cases of mistake of law) upon the principle that every man is bound to know the law. It is not intended to say that the plea of *ignorantia legis* would in all instances be available in civil cases, (in criminal it never can be.) because some legal propositions are so plain and familiar even to ordinary minds, that it would be doing violence to probability to impute ignorance in such cases, but it is only meant to say that where the legal principle is confessedly doubtful, and one about which ignorance may well be supposed to exist, a person acting under a misapprehension of the law

in such a case, shall not forfeit any of his legal rights by reason of such mistake." *Id.*, 525. The injunction was refused and the defendant allowed to proceed at law.

The contracts of sale and transportation made by the directors with Sherman and Dean, not being ratified and confirmed by the stockholders, with that knowledge of the facts and the law required to make such ratification conclusive, the appellants have not forfeited their rights to rescind said contracts and to have the property reconveyed upon terms consistent with equity.

A decree will be passed accordingly.

*Decree reversed and cause remanded.*

