KESSLER & CO. et al. v. ENSLEY CO. et al.

(Circuit Court, N. D. Alabama, S. D. April 15, 1904.)

1. CORPORATIONS—SUIT BY STOCKHOLDERS—RIGHT TO MAINTAIN.

While the mere refusal of the governing body of a corporation to bring suit to redress a fraud committed against it is not a ratification of such fraud, and does not in itself constitute a fraud against the corporation, yet where the refusal is from proper motives, and in the interest of the corporation, it is neither illegal nor immoral, it being the duty of such body in general to act for the pecuniary interest of the corporation; and where its action has been fairly approved by a disinterested majority of the stockholders it is binding on the minority, who cannot, in such case, maintain in their own name, on behalf of the corporation, the suit which the majority have determined to be against its interest as to a purely intra vires matter.

2. SAME—FRAUDULENT CONTRACTS—POWER OF RATIFICATION.

A contract or transaction by which officers have obtained property of a corporation by actual fraud, may nevertheless be ratified by the directors and a disinterested majority of the stockholders where they act fairly, in good faith, and with knowledge of the facts, and for what they believe to be the best interest of the corporation.

3. SAME—REFUSAL OF DIRECTORS TO SUE—BREACH OF TRUST.

It is the duty of the directors of a corporation, when requested by stockholders to bring suit to set aside a transaction by which property was obtained from the corporation by fraud, to consider the question carefully, and determine it solely on its merits, with reference alone to the best interests of the corporation; and a court will not refuse to entertain a suit by stockholders on behalf of the corporation to redress the fraud, where it appears from the allegations of the bill that the action of the directors in refusing to bring the suit was prejudicial to the corporate interests, that they acted negligently, or without proper deliberation, upon a mistaken view of the law with respect to their duty, or from extraneous motives, since in either case their action amounted to a breach of trust, although it is not charged that it was corrupt, or from motives of self-interest; and to establish such facts the complainants may show what was said as well as what was done by the directors at the time their action was taken.

4. SAME—ACTS CREATING ESTOPPEL.

A bill filed by stockholders of a land company which owned a town site and adjoining lands alleged that at a time when the individual defendants were officers and directors of the company they procured a sale of all of its property under a small judgment against the company, which they in fact owned, leaving the company only the right of redemption; that they subsequently procured the conveyance of such right of redemption by the company to trustees, in whom also had been vested the legal title, under a trust by which property was to be sold sufficient to pay the company's debts, when the remainder should be reconveyed; that subsequently defendants by fraud procured the assent of the stockholders to the sale by the trustees of some 200 acres of the choicest land of the company to themselves, through a second company, their ownership of

which they concealed, for a small fraction of its actual value. It further appeared that the trustees sold sufficient lands to pay the debts of the company, and reconveyed the remainder, which the company accepted and still holds. *Held* that, while the company was estopped by its subsequent action from questioning its conveyance to the trustees, it was not estopped from attacking the validity of the conveyance to defendants, in the absence of a ratification or laches, and that the refusal of the directors to bring a suit for the purpose did not amount to such ratification.

5. PLEADING—SUFFICIENCY—QUESTIONS ARISING ON DEMURRER.

In determining the sufficiency of a bill charging fraud, on demurrer the allegations therein are alone to be looked to, and the character of the parties charged cannot be considered.

6. EQUITY—LACHES—NOTICE TO STOCKHOLDER OF CORPORATE ACTS.

In a suit by a stockholder in right of the corporation to require a former officer to account for property which he is charged with having obtained by fraud from the corporation while such officer, the adverse possession of such property by defendant for a period of time within the statute of limitations cannot be held, as matter of law, to impute notice of the fraud to the stockholder, so as to .charge him with laches, nor to charge him with knowledge of what was done at a stockholders' meeting which he did not attend.

7. SAME—FACTS IMPUTING NOTICE OF ACTUAL FRAUD TO STOCKHOLDER—RELIANCE ON INTEGRITY OF OFFICERS.

Stockholders who are complainants in a suit brought in right of the corporation to set aside a conveyance of property from the corporation to some of its officers are not chargeable with notice of actual fraud, which is alleged to have been practiced in obtaining the property, from which laches must be imputed to them, because it must be inferred from the allegations and silence of the bill that they had knowledge of facts which would render the transfer constructively fraudulent, it being alleged that they were ignorant of the actual fraud, and that the reason they did not make further inquiries was because of their confidence in defendants and their reliance upon their acting in good faith as trustees for the stockholders.

8. SAME—SUFFICIENCY OF BILL—OFFER TO DO EQUITY.

A bill by stockholders to set aside an alleged fraudulent sale of property by the corporation to defendants, which alleges that they have sold a portion of the property to bona fide purchasers, prays an accounting by defendants, and offers to allow them credit for any sums expended which will inure to the benefit of .the corporation, contains a sufficient offer to do equity.

In Equity.   On demurrers to amended bill.

See 123 Fed. 546.

This is a bill by minority stockholders of the Ensley Land Company, filed in right of the company, which refused to sue, to set aside certain transactions between the company and the respondents, who it is alleged, while occupying fiduciary relations, defrauded the corporation in the sale of 240 acres of land, of which respondents became purchasers.   On demurrer to the original bill the court held that, as the majority of the stockholders and the two boards of directors, who refused to authorize the suit, were not charged to be interested, or acting from improper motive, the decision, which related to a matter intra vires, bound the minority, as it did not appear, on the facts shown by the bill, that it was to the interest of the corporation to bring suit, or that the directors and stockholders had not fairly decided the matter in the interest of the corporation;   and also that the complainants had been guilty of laches.   The case is reported Kessler & Co. et al. v. Ensley Co. et al. (C. C.) 123 Fed. 547.   The bill was amended in particulars sufficiently shown in the present opinion.   The respondents again demur.   To distinguish the Ensley Land Company from the Ensley Company, and for the sake of brevity, the Ensley Land Company is referred to as the "Land Company," and the Tennessee Coal, Iron & Railroad Company is called the "Tennessee Company."

T. M. Steger, Smith & Smith, J. W. Baker, and I. K. Boyesen, for complainants.

Knox, Bowie & Dixon, Walker, Tillman, Campbell & Morrow, James C. Bradford, J. F. Martin, and E. J. Smyer, for defendants.

JONES, District Judge (after stating the facts as above). It was not ruled on the former hearing, as complainants seem to suppose, that the refusal of the boards of directors and stockholders, under the circumstances stated, to bring the suit, amounted to a ratification of the transactions complained of; but that, in view of the case disclosed by the original bill, the minority was bound by the action of the governing body, which was not charged to be interested, or acting from improper motive. It was stated arguendo that an honest and disinterested governing body or majority of stockholders, if rescission would not be advantageous or would be harmful to the corporation, might ratify actual fraud practiced on it by an officer or director. Complainants devote a large part of their argument to combating the correctness of the former opinion on these points. They insist that a corporation cannot in any case ratify a transaction whereby its officers obtain corporate property of large value by actual fraud, save by unanimous consent of the stockholders; and that the court, by refusing to entertain the stockholders' bill, when the corporation refuses to sue, enables the governing body or majority to accomplish indirectly, against the protest of the minority, that which could not be done directly save by unanimous consent. Upon these premises they vigorously contend that the governing body has no discretion to refuse to sue in a case like this when the minority demand it, and that their refusal to sue confers upon the minority an absolute and imperative right, beyond the power of a court of equity to control, to file the bill in their own name, making the corporation a defendant.

1. There is a manifest distinction in principle between committing a fraud upon a corporation or piling one fraud on another by abuse of corporate authority in vicious ratification, and the refusal by the governing body, on proper motives, of a request of some of the stockholders to bring suit to redress the fraud. Of and in itself the mere refusal to sue cannot be ratification. Unless the situation has been so changed, in consequence of the refusal, as to work an estoppel to complain of the fraud, the governing body may change its policy at pleasure. Of and in itself it is neither illegal nor immoral to refrain from redressing a fraud by suit. In the very nature of things, a refusal, in the interest of the corporation, to bring suit, cannot amount to a fraud upon the stockholders. They are allowed to bring suit when the corporation fails to do so solely to "prevent a failure of justice." The failure of justice to be prevented is the failure of justice to the corporation. The transaction here complained of is wholly intra vires, and involves private, not public, wrong. The complaining minority stockholders and the other stockholders alike assert only the right of the corporation. They have no independent rights against one another, or against the corporation. The only right which any stockholder may assert in a case of this kind is subject to the police power of the govern-

ing body, and the extent of the stockholder's right is narrowed and restrained by the fair exercise of this power.

Enforcing a corporate right, especially when, as here, the corporation must restore the purchase money and surrender the right to enforce the performance of other conditions of the sale in order to regain that which it sold, may be decidedly to its disadvantage. It is frequently the highest wisdom to refrain from attempting to redress violations of right. Probable gain is generally balanced against probable loss. Modern jurisprudence assimilates corporations as far as possible to natural persons in determining their discretion and power as to such matters. The governing body is expected, within the limits of the charter, by all means not violative of law and good morals, to promote the pecuniary advancement of the corporation in its dealings, whether with its own officers or third persons. Bearing this in mind, and that it is not the fact that a fraud has been committed, but the fact of rightful or wrongful refusal to redress the fraud, which determines whether equity will aid the stockholder, the question is not of difficult solution on principle. The stockholder appeals to the conscience of the chancellor at the very threshold of the litigation to set aside the judgment of a corporate tribunal provided in advance, to determine primarily for every stockholder the very question brought before the court. The law does not presume fraud, misconduct, or infidelity on the part of the directors; on the other hand, in the absence of showing to the contrary, presumes that they acted rightly and properly. When the governing body is not challenged as in any wise unfit or interested, and no ulterior or improper motive is imputed to it, the decision by such a body is prima facie right, and must stand, unless the court can see from the facts stated in the stockholder's bill that the 'decision, upon the facts presented, proves its own unworthiness—shows a failure of justice to the corporation, if the stockholder is not permitted to sue.' The only right of the stockholder here is to show that the corporation has been wronged by the refusal to sue, and in that event to sue for it. Both factions have equal right to be heard on that question, not only before the court, but before the governing body. If the corporation's interest will not be promoted by suit to redress the fraud, there is no wrongful refusal to sue, no foundation for the stockholder's equity to compel suit, and no threatened failure of justice to the corporation to be averted. Of necessity, then, the governing body in every intra vires matter has a discretion to determine what action to take on the stockholder's request to sue; and when the stockholder comes into court the first question it must determine is whether that discretion has been properly or improperly exercised.

2. The assertion that a disinterested corporate body or majority of stockholders of a business corporation are powerless in any case, against the objection of a single stockholder, to ratify actual fraud, as to a matter intra vires, upon the corporation by one of its own officers, by which he obtains some of its property, cannot be accepted as a correct enunciation of the law. The case in hand involves an executed sale and conveyance of land thereunder, made under the confessedly corporate power to sell land to pay corporate debts. The vice imputed to the transaction is that it was accomplished by actual fraud of the corporation's

officers who became purchasers. Individual stockholders have no such interest in a purely corporate asset, or the undivided corporate property of a solvent, going corporation, as entitles them, in a case of this kind, to exact unanimity on the part of the stockholders before the corporation can have or exercise judgment of its own as to the wisest course to pursue with reference to a fraud concerning it. Want of unanimity in such a case cannot dethrone the governing body, or suspend or repeal those provisions of the charter which define their powers and duties, or transfer the duties and rights of the corporation in the premises to the minority. If the interests of the corporation are promoted by the refusal to sue, or by ratification, it is unconscientious to insist that it has been wronged by either ratification or the refusal to sue. That is quite a different thing from committing or defending a fraud. The stockholder, having only derivative and subordinate rights, cannot force the corporation to do that which will harm it, or fairly complain when it elects, for its own good, to stand upon the transaction, rather than repudiate it. The books are full of cases where corporations have been wronged by actual fraud of their officers. The corporation may hold them to such transactions, unless the thing done is forbidden by law, or condoning it is contrary to public policy. If the transaction in which the officer defrauded the corporation is one into which it might enter in the first instance, it is not contrary to public policy for the corporation to condone the fraudulent contract, and insist upon its performance, on sufficient consideration and motives. The wrong here is a private wrong, and a private person may condone a private wrong when the rights of the public or strangers are not involved. All the cases admit that the person defrauded, if sui juris, can ratify the fraud. The corporation is certainly sui juris as to matters intra vires. The difference in the cases results from the view taken of "the person" defrauded in a case of this kind. The cases which deny the right of the governing body to ratify insist that the whole body of stockholders make up and constitute "the person" who is defrauded, and necessarily that unanimity of the stockholders is required to create the assent of that person. These cases entirely ignore the nature and limitations of the right asserted and consequences which flow from it to the corporation, the only tests which determine whether the majority may ratify, when fairly done, against the wishes of the minority. Here the transaction sought to be avoided is already accomplished. Rescission cannot be made by the minority, it must be effected by the act of the corporation or of the court. The minority has only a joint interest with other stockholders, and the disinterested majority of the whole interest, in the absence of fraud, bad faith, and the like, determines what is best for the corporation. Equity in cases of this sort steps in, and strikes down either ratification or refusal to sue, only when the governing body has abused the corporation in ratifying the wrong, or in refusing to sue, or is unfit or interested, or dominated by improper motives, or has acted negligently, without the exercise of reasonable judgment and prudence, or in some way has been misled or deceived.

3. Complainants cite a number of cases to sustain their contention. It is impossible to analyze them all without unduly lengthening this opinion. The leading case upon which they rely is Cumberland

129 F.—26

Coal Company v. Sherman, 30 Barb. 577. It was there held that a majority could not ratify a sale of land made by a director to himself, although there might be no actual fraud. In this respect it is directly opposed to Twinlick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Hotel Co. v. Wade, 97 U. S. 13, 24 L. Ed. 917; Pneumatic Gas Co. v. Berry, 113 U. S. 322, 5 Sup. Ct. 525, 28 L. Ed. 1003. In the latter case it was charged that defendants, who stood in fiduciary relations, "had in their possession, unaccounted for, at least sixty thousand dollars," derived from a lease made without authority, which belonged to the company. There had been much dealing with the directors, and finally they settled with the defendants, and executed a formal release. Under the circumstances, there being no bad faith, fraud, or concealment charged in the settlement, the release was upheld. The precise statement by the court in Cumberland Coal Co. v. Sherman, on this point, is:

"But, even if the confirmation had been legally made, and by a majority of the stockholders—which it clearly was not—when, as in this case, it must be made by a class, the sanction of a majority could not be obligatory on the rest; but the confirmation, to be complete, must be the joint act of the whole. Ex parte Hughes, 6 Vesey, 622; Ex parte Lacey, Id. 628; Ex parte Jones, Id. 377; Davoue v. Fanning, 2 Johns. Ch. 264."

Cumberland Coal Company v. Sherman, is largely, if not entirely, rested on Davoue v. Fanning, supra. In Davoue v. Fanning, Chancellor Kent, speaking of the Yorks Building Co. v. McKenzie, in the English House of Lords, on a like question, said that "it is perhaps one of the most interesting cases on a mere technical rule of law that is to be met with in the annals of jurisprudence." He founded his ruling in Davoue's Case upon the decisions of Lord Eldon. Chancellor Kent cites a decision of the New York Court of Appeals in Munro v. Allaire, 2 Caines, Cas. in Error, 183, 2 Am. Dec. 330, and regrets that Mr. Justice Benson, who delivered the opinion of the Court of Appeals, "much weakened the rule in the subsequent part of the opinion." Chancellor Kent says:

"Justice Benson makes a distinction to show that the rule thus laid down is not to be understood in absolute and unqualified sense. A trustee, it is said, is never to be assisted in this court by giving effect to such a purchase; but it does not follow that chancery is bound in every case, and of course, to annul such a purchase on the application of the cestui que trust. His words are that it is not in every instance indispensable that all the cestuis que trust should agree to waive the implied fraud. It may be sufficient for a majority, or such other number or proportion of them, to agree as to that, according to the circumstances of the case, it may be presumed there was no fraud in fact."

Lord Eldon, whose decisions are the main foundation of Davoue v. Fanning, declared in Sanders v. Sanders, 13 Vesey, 603, "he had frequently laid down as a principle in bankruptcy that, where trustees for infants had purchased trust property, the court would not disturb the sale if it appeared to be beneficial to the infants, and would disturb it if it did not appear for their benefit." That principle, his lordship added, "though open to objection, must be adhered to until a better could be found." Lord Hardwicke, in Whelpdale v. Cockson, 1 Vesey, 9, s. c. 5 Vesey, 692, held that a majority of the cestuis que trust were sufficient to establish the purchase, whether the minority

consented or not. On a creditors' bill against executors he ordered the creditors to elect whether they would abide by the purchase, and declared that, if the majority elected not to abide by it, he would order a resale. Chancellor Kent says that case was questioned and practically overruled in later cases. He puts his objection to it on the ground that "it seems contrary to the settled rights of the parties; for one cestui que trust has no power to control or give away the rights of another." It is to be observed that Lord Hardwicke in no way denied the principle that courts, on grounds of inexorable public policy, would set aside a trustee's purchase at his own sale, no matter how fair and free from fraud or imposition, as a matter of course, on seasonable application of the cestuis que trust. The divergence is only on the point whether the minority or majority is to be regarded as the cestuis que trustent who may complain of the sale. Chancellor Kent's reason for ignoring the wishes and interest of the majority is that "one cestui que trust has no power to control or give away the rights of another." Do we not inevitably give one cestui que trust "power to control the rights of another" when we allow minority stockholders to control the action of the corporation against the wishes of the majority stockholders? Kent was dealing with the case of cestuis que trustent whose rights against their trustee were several, direct, and primary; and not one like this, where the right asserted is purely derivative and joint, having to be worked out by enforcing the right of a third person, for whom a majority of those interested in the estate have the right to speak, and to elect not to attack the sale, if they act fairly and in good faith. He was not dealing with a case which involved not merely the question of resale, but also the disposition of the thing sold, and the abandonment of some other contract with the purchaser in connection with it, the loss of which might far outweigh any advantage from setting aside the sale. The doctrine he applied was intended as a shield for cestuis que trustent, and not to furnish a sword with which the few may stab the rights of the many, where all belong to a class whose correlative rights and duties are fixed and prescribed by contract among themselves, that the majority, acting disinterestedly and fairly, shall control. Exacting the rule of unanimity which Chancellor Kent applied to an entirely different case, in a case like this, is tantamount to declaring that the majority stockholders have no rights which the minority or the courts are bound to respect in setting aside a sale. The doctrine is, as Chancellor Kent described it, "a mere technical rule of law," which ought not to be allowed in equity to override substantial justice, or to enable a stockholder to harm a corporation, when his only equity in the premises is to sue to benefit it.

The case in Cumberland Coal Company v. Sherman, supra, came before the Supreme Court of Maryland, and is reported under the title Hoffman Steam Company v. Iron Co., 16 Md. 456, 77 Am. Dec. 311, and Cumberland Coal & Iron Company v. Sherman, 20 Md. 117. Unlike this case, it was an effort by the wronged corporation to rescind. It presented a flagrant example of attempts by the use of corporate power by an interested and dishonest majority to put corporate assets in the pockets of some of the stockholders to the prejudice

of the rest. Neither of those cases is authority to the point that actual fraud of an officer may not be ratified by the governing body, or by the vote of a majority less than the whole number of cestuis que trustent, if they are not interested in the fraud, and act upon good motives and sufficient consideration. The implication from their language is to the contrary. Brewer v. Boston Theater, 104 Mass. 394, expressly admits the right of a corporation in a case of this kind, when it acts through a disinterested and competent governing body, to ratify actual fraud upon it by its officer. It holds that a case like this is an exception to the rule it lays down, and cites Great Luxembourg Railway Co. v. Magnay, 25 Beavan, 586, on this point. Other cases, of which Hazard v. Durant, 11 R. I. 195, is an example, declare that a majority cannot "wantonly," or "willfully," or "gratuitously" condone a fraud against the wishes of a minority. These decisions go no further than to hold that ratification, which might otherwise be valid when made by a disinterested corporate tribunal, is fraudulent as to the stockholders, unless based upon a fair consideration moving to the corporation. The fact that harm would come to the corporation from rescinding is sufficient consideration for ratification, and takes the act out of the category of willful, wanton, or gratuitous abandonment of corporate rights, or gifts of corporate property, which at last are the things which are the essence of the fraud, of which these cases speak, upon the rights of stockholders. Greenwood v. Freight Company, 105 U. S. 16, 26 L. Ed. 961, is not in point. The Legislature repealed the charter of a corporation. Greenwood, who was a stockholder, insisted that the repeal impaired the obligation of the contract made by the charter between the state and the corporation within the meaning of the Constitution of the United States, and insisted that the directors bring suit to test the matter. It was clear, upon the facts stated, if the corporation had any rights, not to allow the stockholders to sue when the corporation refused would amount to its destruction. The court could see on the face of the bill that the corporation had all to gain and nothing to lose by bringing the suit. Heath v. Erie Railroad, 8 Blatchf. 347, Fed. Cas. No. 6,306, involved not only ultra vires, but illegal, acts, and the corrupt use of corporate power by the wrongdoers for their own benefit. It is not at all in point on the question here involved. Atwool v. Merriwether, 5 L. R. Eq. 649, sheds no light whatever on the principle which must govern in a case of this kind. In that case individual shareholders, who had been induced by a fraudulent prospectus to subscribe and pay for stock in a corporation formed solely for the purchase of a worthless mine from a person who, in connection with the promoter, had hatched out the scheme to promote the corporation and have it buy the mine, and afterwards defrauded it as to the price, on which partial payment had been made, sought by bill in their own right to rescind their subscriptions to the stock, and to recover what they had paid, on the ground of the fraud, and, as ancillary relief, to rescind the corporation's contract for the purchase of the mine, to get back what had been paid on it, and to wind up the corporation. The owner of the mine, the promoter, and the company were all made defendants. The company had paid out on the purchase money all the payments

made on the stock subscribed.  Plainly, the complainants there asserted direct, purely personal, and primary rights of their own against the corporation, the owner of the mine, and the promoter.  They each had a direct, individual, and personal right to rip up and unravel the fraud from beginning to end, regardless of anything the corporation might wish to do, in order to get their money back.  The fraud and seasonable offer to rescind destroyed the relation of stockholder, if it ever existed, and tore down any foundation which might otherwise exist of any implied right of any stockholder to interfere with the defrauded party, or to control him in dealing with a direct personal fraud on himself.  The purchase of the mine by the corporation was the main spring of the fraudulent contract by which the corporation was brought into being and the complainants became stockholders, and the stock subscription and the corporation's purchase were all parts of one and the same fraud.  It is quite clear, in such a case, that the personal, individual rights of the party defrauded could not be controlled or altered in any way by anything the other victims of the fraud might wish to do as to the wrong done them.  It was of such a condition of things that Vice Chancellor Wood said:

"The whole thing was obtained by fraud, and the persons who may possibly form the majority of shareholders could not in any way sanction a transaction of that kind.  I think in this particular case it is hardly necessary to rely upon that, because having it plainly before me that I have a majority of shareholders independent of those implicated in the fraud supporting the bill, it would be idle to go through the circuitous course of saying that leave must be obtained to file the bill for the company."

Here, there is no majority supporting the bill.  Here, the relation of shareholders is undoubted and undisputed.  Here, the rights of complainants are purely derivative.  Here, the fraud does not go to the existence of the company, or the contract by which complainants became members.  The rights of the stockholders, as among themselves, can in no wise be changed, whatever may have been the fraud as to the sale and purchase of the 240 acres of land; for their relations to one another were in no wise affected by it.  Complainants here have, in effect, intervened, "not as individuals, but as shareholders, in the assertion of rights common to the shareholders, which the corporation itself has declined to protect."  Big Creek Gap Co. v. American Loan & Trust Co. (C. C. A.) 127 Fed. 633; Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423.

Bigelow on Fraud, vol. 2, p. 645, does not sustain the complainants.  The doctrine which Bigelow combats, and which we do not at all assert, is that a majority "have no right to use corporate control for the purpose of appropriating the property of the corporation or its avails or income to themselves, or to any other shareholders, to the prejudice of the others."  To bring that doctrine into play, the governing body or stockholders whose act is challenged must avail themselves of the corporate control to appropriate property to their own benefit, or to the "exclusion" or "prejudice" of other shareholders.  There is no "prejudice" to any shareholder in refusing to sue; he is not deprived of his "rightful share" in any corporate asset, if suit is not to the interest of the corporation, although the result may be to leave some corporate property in the hands of an individual shareholder who has wronged the

corporation. On the case presented in the original bill, the body which it is urged could not ratify was neither interested, nor improperly controlled, or gained anything by their decision which the corporation lost, but only refused to sue, presumably after exercise of judgment on the merits, because it was against corporate interests. The interest which the minority stockholder has the right to call on the governing body and the court to protect is the value of the interest which will inure to the corporation after striking a balance of loss or gain between standing by or rescinding the fraudulent transaction. He has no equity to say to the corporation that the refusal to rescind—leaving corporate property in the hands of a wrongdoer—to that extent "diminishes the value of my shares," and "you must, therefore, at all hazards, increase the value of my shares by getting that property back, though by doing so you may entail far greater loss on the corporation and depreciation in the value of all the shares than if you allowed the unlawful transaction to stand." There is no "exclusion of" or "prejudice" to any stockholder, or depriving him of his "rightful share," when the majority, in the interest of the whole, declines to bring loss upon the corporation in such a case. Equity is perverted when, warped by obedience to a "purely technical rule of law," it allows the individual stockholder to use its powers to harm fellow shareholders, as innocent as himself of any wrong, and equally deserving of protection, in the direction of the common enterprise. Ratification of a wrong is but the exercise of the rights and liberties of the person wronged. It is one of the powers and incidents of ownership. The right may extend to actual as well as constructive fraud. On principle, how can the presence of fraud vel non in the transaction determine the ownership of the thing fraudulently obtained, or who may ratify the fraud? Upon what principle of logic or reason can a disinterested majority, acting fairly, be conceded the right to condone a constructive fraud, and yet be denied the right to condone actual fraud? It is wholly immaterial in ascertaining the owner of a thing wrongfully taken, or who has power to ratify the fraud, whether its possessor was deprived of it by constructive wrong or by actual fraud. The law itself determines in this case. The corporation is the person who was defrauded—the person who, as to matters intra vires, may ratify or condone the wrong done the corporation. There can be no doubt as to this when we consider who the stockholders of a business corporation are, the purpose and law under which they associate, and the inevitable implications which result from such association, as to their power to speak for the corporation. They form their relations to each other and the corporation voluntarily, by contract, and for the financial gain of the body as a whole. They contract to submit to the choice and direction of the majority, within certain limits, as to the redress of wrongs to the entity called the corporation, which equity regards as wrongs to the stockholders, solely because they are the ultimate owners of the property of that entity. The law provides corporate tribunals to determine, among other things, as to the ratification of such wrongs. The stockholders elect the persons who constitute this tribunal, to whose decisions they voluntarily contract in advance to submit. The rights of persons thus associated by contract, as against each other, about a matter purely intra vires, in the

direction of the common agent, in furtherance of a joint purpose, depend upon entirely different considerations from those which govern courts in passing upon the rights of ordinary cestuis que trustent to control one another as to ratification of fraud upon their rights by a trustee. In the latter case the minority cestuis que trustent have several, direct, and independent rights against their trustee, and have no binding contract between the majority and themselves that the majority, when acting fairly and in good faith, shall settle such questions; and the law as to them has not authorized any tribunal other than the courts to intervene, and, when acting fairly, to bind the minority, under any circumstances, to any extent, in the decision of such matters.

Less than 50 years ago the Supreme Court of this state held that the owners of a steamboat, whose crew willfully ran down and sank a flatboat, were not responsible for the wrong. It held, likewise, that a corporation could not commit a libel, or be guilty of malicious prosecution. In applying the doctrine of ultra vires, it held that a charitable corporation which loaned out its funds for investment could not recover the money either under the contract or in an action for money had and received. These rulings largely represented the doctrine prevailing in those days. What court would now think of measuring the rights and liabilities of corporations in that regard by the old decisions? Courts of law and equity have constantly expanded or contracted the application of old and general principles to meet the exigencies of modern corporate development, and in properly adjusting the changed rights and relations born of new conditions. "The sound administration of justice" will be best promoted by equity's so molding its decrees in cases of this kind as not, on the one hand, to give such effect to merely technical consideration of the nature of the artificial person called the corporation, as will improperly hamper the conduct of its business; nor, on the other hand, to enable the governing body to oppress or injure creditors or stockholders who are, in equity, the real owners of the corporate property. Pomeroy's Eq. § 111.

4. On the case made by the original bill it was quite plain that the application to sue was properly denied. It did not appear what was the value of the different undertakings of the Ensley Company, and hence it was not shown that the sale of the lands was for an inadequate consideration, or that it was to the interest of the Land Company to rescind. Vested rights of creditors would have been interfered with, and the corporation put in peril, by ripping up transactions which resulted in the trust deed. It did not appear that the refusal to sue was not the result of the exercise of judgment on the merits. It was only stated that there was a refusal to hear and to sue. It is now shown that the Tennessee Company has paid off the debts of the Land Company, and the property has been reconveyed to it freed from the trust. It is now alleged that "none of the defendants"—which includes the Land Company—ever treated the proposition of the Ensley Company as binding, but that it had been in fact waived or abandoned by mutual consent, and that improvements actually made on the land and industries attracted there, with the exception of a few houses built by respondents, were not due to any effort or investment by the Ensley Company, but were caused by the location of the steel plant. On the case

as now stated the real consideration for the sale of the lands, charged to have been accomplished by deceit practiced by respondents while they exercised the powers of the corporation, was $20,600, at a time when the lands were worth over ten times that sum. It now appears that the directors were informed by one of their own number, when urging before the directors' meeting that suit be brought, that the directors and officers of the Ensley Land Company had "fraudulently acquired the choicest and most valuable parts of the lands of that company, worth over two hundred thousand dollars, for about eighteen thousand dollars," and in causing the conveyances complained of respondents had been actuated in their own interest and for their own benefit. The bill does not profess to state all that took place at the directors' meeting, but it does specifically declare that "the only reason" given by the majority for opposing the suit by the Land Company was that "such suit by the company might do the defendants with whom the directors and stockholders sustained business and personal relations great injury by charging them with having committed a fraud on the company, and that they were unwilling, by reason of their personal relations with defendants, to vote that such a suit be brought against them by the company; that, if any stockholder had a grievance, the courts were open to it." It is further alleged that the application to the other board of directors and stockholders was rejected "for the same reason assigned above."

Under such circumstances is the court authorized to go behind such action of the stockholders and directors, not charged to be interested or acting from selfish motives, as to a matter intra vires, and overturn their decision? It cannot be denied upon the facts stated that it was to the interest of the corporation to bring suit, nor could there be doubt among fair and reasonable men what course fealty to the corporation demanded at the hands of the governing body. Boards of directors occupy fiduciary relations to the stockholders, and are bound to exercise care and diligence proportionate to the importance of the matters committed to their charge. Although equity will not remove a director who is a statutory fiduciary, as it would an ordinary trustee, it will not hesitate in proper cases to enjoin a director, or to set aside acts of misconduct amounting to a breach of trust, which oppress a stockholder or militate against the well-being of the corporation, as well as to hold him personally accountable therefor. Want of proper care must not be confounded with honest mistake of judgment. Denial of request to sue without passing judgment on the merits must not be confused with the exercise of judgment as to the merits of the suit. The decision with which we are here concerned does not involve peculiar skill in art, trade, or business, knowledge of markets, capacity to direct labor or skill or to cope with financial and industrial situations, or the doing of any of the things required to accomplish the mission of the corporation, which, in a qualified sense, are sometimes denominated the "legislative functions" of the corporation, and go to make up what is properly termed "corporate administration." The matter concerns the executive or ministerial, rather than the legislative, function of the corporation. When all disinterested and fair men, upon the facts upon which the directors' act is challenged, would reach the conclusion that

the decision not to sue was improper, and greatly prejudicial to corporate interests, and it appears that the directors have been negligent, or have not deliberated or passed judgment on the merits of the question, and refused to sue for some extraneous reason, or upon a mistaken view of the law, the court cannot refuse to intervene, although the directors may have been honest and disinterested.  Gamble v. Q. C. W. Co., 123 N. Y. 99, 25 N. E. 201, 9 L. R. A. 527; Briggs v. Spaulding, 141 U. S. 147, 11 Sup. Ct. 924, 35 L. Ed. 662; Hollins v. Brierfield Coal & Iron Co., 150 U. S. 385, 14 Sup. Ct. 127, 37 L. Ed. 1113; Griffin v. Pringle, 56 Ala. 492; Hun v. Cary, 82 N. Y. 74, 37 Am. Rep. 546; Pomeroy's Eq. Jur. § 1070.

Respondents insist, "where the directors and stockholders have the power to act, and are not adversely interested to the company, nor acting from selfish interest, the motives which led them to decide as they did cannot be inquired into."  It is urged that it is improper to inquire into their motives for the same reason which forbids inquiry into the motives of members of the Legislature.  The functions of directors and legislators in matters of this kind are unlike.  Within the limits of the Constitution the legislator's discretion is absolute and irrevisable.  Within the limits of the charter, which stands for the constitution of the corporation, the directors have no unlimited discretion about ratifying a fraud or refusing to redress it.  They have no unlimited "power to act," and to bind their constituents, as the legislator has within the limits of the Constitution.  They have the undoubted power to pass upon the question of redressing frauds upon the corporation, but it is a qualified authority, in the employment of which they must use diligence to learn the facts, and exercise reasonable judgment upon the merits of the matter.  If they act upon such matters negligently, without considering the good of the corporation, and are moved by extraneous considerations to wrong and injurious results, they commit a breach of trust.  The directors under no circumstances have the right to gratuitously and capriciously abandon or give away the rights of the corporation, either to a stockholder or to a stranger.  Whenever it clearly appears that they have done so, a clear breach of trust is shown, and the courts will disregard such action.  The directors have not been vested with power to do such a thing "in any event."  It is without the limits of the powers or discretion granted by the charter.

In complaints of this kind the decision of the court will turn mainly, and generally entirely, upon the rightfulness and propriety vel non of the action taken in view of the situation upon which the directors acted.  If the situation clearly justifies the action of the directory, or, on the other hand, clearly shows that it was a breach of trust, the motives which inspired them either way, whether good or bad, are entirely immaterial in either case.  Right action, though from bad motives, will not be disturbed, "for in equity, as at law, a fraudulent intent is not the subject of judicial cognizance, unless accompanied by wrongful act."  So, also, where the action taken is plainly negligent and unjustifiable, good motives will not sustain it; since a breach of trust cannot be upheld in equity by showing that it was committed from good motives.  It is only "when the action of itself is lawful" that the case falls within the rule of Oglesby v. Attrill, 105 U. S. 609, 26 L. Ed

1186, that inquiry will not be indulged as to the motives with which it was done. There are many situations which are not so marked as to clearly point out and prescribe the duty of the governing body, leaving the question whether their action was a proper corporate determination or not to depend upon other considerations. In such cases the dissentient stockholder, to repel the presumption otherwise indulged that the decision was a proper corporate determination, may show that the directors abdicated their function of passing judgment, and neglected to exercise diligence and care in ascertaining the truth as to the corporate matter with which they dealt, and that allowing the decision to stand will work wrong and oppression to the stockholder. In such cases the court must exercise an independent judgment of its own as to the propriety of the decision of the directory; and the dissentient stockholder, in this connection, unquestionably has the right not only to show the real situation with which the governing body dealt, but that in dealing with it it pretermitted the question of corporate interest, and did not pass upon the merits, but, without considering either, acted wrongly under the pressure of other motives. To this end he may show what the directors said, as well as what they did, at the meeting which took the action complained of. Such declarations, of course, are not necessarily binding upon the court, but may, when taken in connection with other facts and circumstances, be given such weight as they deserve in view of all the surrounding circumstances. The amended bill makes it plain that there could be no reasonable room for doubt as to the duty to sue, and, further, that the refusal to sue was not due to the conviction that suit was uncalled for, or not advantageous to corporate interest, but resulted either because the directors were unwilling, for personal reasons, to litigate with those whom it was their duty to bring before the court, or that they were laboring under a mistaken view of law that they had no duty in the premises, and that the rights of stockholders could not, in any event, be affected by their refusal to act. Under these circumstances the refusal to bring the suit was a breach of trust, and does not bind the stockholders, and furnishes no reason why the court should refuse to entertain their bill.

5. It is urged, if the court entertains a bill of this kind at the instance of minority stockholders challenging the action of the directory, as to matters purely intra vires, when the directory is not charged to have been interested or to have acted from selfish motives, it puts it in the power of any dissatisfied stockholder to substitute the court for the board, and embroil the corporation in litigation over the merits of every internal matter about which the stockholders differ, although the directors have properly determined it, and their action be proved to be wise and prudent. To justify refusal to entertain a bill making charges like this, the court would be compelled to hold that a disinterested governing body, not actuated by selfish motives, could not commit a breach of trust as to matters intra vires. This, we have seen, they can do, although honest and disinterested, when they act negligently, and do not exercise common prudence in passing judgment on the matter which they are called upon to decide. If the law were otherwise, disinterested directors, not acting from selfish motives, would be absolute dictators as to all matters intra vires, and there

would be no remedy, although they were negligent, whereby great wrong and oppression were inflicted upon the stockholders. Besides, will it do to say that the directors are not acting from selfish motives when, from considerations of personal regard for wrongdoers, or disinclination to incur their enmity, they pass over the merits of a suit, and decline to bring it, in disregard of their official duty? Moreover, the governing body is under no necessity, unless it chooses to take such burden, to take part in the litigation at large, or to risk the vindication of its decision upon the facts stated by its adversaries, as it necessarily does when it allows the matter to be tested on demurrer to the bill. If the action of the directory is proper, regardless of the merits of the original controversy between the stockholders, and its position has been misstated, the directory, by interposing a proper plea to the whole bill, disclosing the real truth, may confine the litigation to that question alone. The court would ordinarily set the case down for hearing, in the first instance, on that plea, and, if the proof sustained the plea, that would end the litigation. The Land Company has not availed itself of this right. It has answered, in substance, that it knows nothing about the frauds, and can neither admit nor deny them. The answer, of course, cannot be looked to in passing on the demurrers of the other parties. If it could be looked to, it would show a plain case of utter indifference to corporate interest and negligence in the discharge of duty in refusing to bring a suit, when the directors knew nothing about the merits, and the charges, if true, made it the manifest duty and interest of the corporation to sue.

6. The Land Company lost title to its land by the sale under the Warner judgment. Mrs. Warner conveyed to the Ensley Company, which in turn conveyed to Barker and Bowron. The conveyance to them, together with what was done under color of the proceedings of the stockholders' meeting of January 25, 1898, resulted in the trust and legal title in Barker and Bowron. The Tennessee Company, for the Land Company, afterwards paid a large sum of money, which liquidated the debts of the Land Company, and thereupon the trustees conveyed the lands to the Land Company, which now claims and holds them through and under these conveyances. The Land Company for years has acquiesced in the several transactions, availing itself of their benefit, dealt with the trustees, inevitably made some sort of settlement with them, and took title in subordination to them, unquestionably after full knowledge of the facts. The Land Company and all claiming in subordination to it are now estopped to assail these conveyances. "A court of equity does not listen with much satisfaction to the complaint of a company that transactions were illegal, which had its approval, which were essential to its protection and the benefits of which it has received." 113 U. S. 327, 5 Sup. Ct. 525, 28 L. Ed. 1003. Besides, respondents claim and have no estate or interest in this part of the lands, and the rights of the parties could in no way be advanced by setting these transactions aside, or decreeing that the trust has ended as to them, or that respondents held whatever interest they acquired in them in trust. The bill itself shows that the trust has ended as to this part of the lands, and

all the equitable and legal estate is already back in the Land Company.

7. The right of the Land Company to assail the title to the 240 acres of land bought from the company's trustees by Ramsey and McCormack and the Ensley Company, or to hold the trustees to account for other portions not reconveyed, depends upon considerations not applicable to the rest of the lands. Barker and Bowron's conveyances of these 240 acres of land to respondents form no part of the chain of title of the Land Company. It neither took nor holds any of its property in subordination to these conveyances. It occupies no inconsistent attitude in assailing them. The retention of the purchase money while respondents were in control of the Land Company, or their knowledge of the matter, cannot, of course, be imputed to the Land Company, as evidence of ratification or estoppel. It has done nothing, so far as appears by the bill, which shows any intent to ratify the acts of the trustees in this particular, or which estops the corporation from assailing them. These conveyances may be ratified if the majority, upon sufficient consideration, after full knowledge of the facts, deliberately take such action. Until such action, the corporation, within any period short of the bar of the statute of limitations, before inaction with knowledge has built up an estoppel, can assail these conveyances for fraud; and the complainants may assert its rights in this respect if the action of the governing body, in refusing to sue, does not foreclose them, which, as we have seen, it does not, and they have not been guilty of laches.

8. The purpose and motives of the respondents throughout all the stages of these transactions are bitterly assailed both in the bill and in the argument of counsel. It is not to be gainsaid that a positive charge of fraud, though on information and belief, must be accepted as fully on demurrer as though made on positive knowledge. It does not suffice, however, to charge fraud as a mere conclusion of the pleader, but the facts out of which it arises must be stated. Where the acts and transactions upon which are based the bad motives ascribed are fully set forth, the court will look to all that is detailed to determine whether the inference of fraud is well founded, no matter how positively it is charged in general terms. It is not true that there was studied concealment about the whole matter from the inception of the transaction. The situation of the Land Company for some time before the sale under the Warner judgment, in the then condition of the times, must have impressed every one who knew anything of its affairs that something must soon be done to prevent a race of diligence among its creditors, which might start at any time, and result in ruin of the enterprise. The inevitable inference from complainants' bill, which for some reason does not inform the court as to complainants' knowledge on these points, is that the complainants knew at the time of the critical condition of the corporation, though they may have been unacquainted with the details or the proximate amount of its debts. The just inference is that they knew of the sale under the Warner judgment shortly after it occurred. If the title had been taken directly to the Land Company after the sale under the Warner judgment, or when there was redemption from it, as

complainants insist ought to have been done, it would have accomplished no useful purpose, and would only have invited other sales. Complainants, who appear to be men of affairs, would hardly have insisted at either time that it was wise to take the title directly in the name of the Land Company, when there were numerous creditors, some of whose debts were already in judgment, ready to pounce upon the property. In order to extricate the enterprise from its difficulties, it was necessary to put the property, if it could be done, in a situation where individual creditors could not redeem on their own account alone, or to the disadvantage of other creditors, so as to force some common agreement with all. It was manifestly the part of wisdom to induce creditors to consent to put the lands in the hands of trustees, and to wait until they could sell the lands in the ordinary way, rather than to attempt to meet the demands upon the corporation by forced sales at ruinous sacrifice. Ramsey made his proposal at an annual meeting. The publication of notice thereof in a Birmingham paper, though the meeting itself should have been held at Ensley, certainly gave more publicity to the call than if the publication had been made at Ensley, a neighboring, and much smaller, but most closely connected, business town. The bill shows the place of meeting fixed by the by-laws. There must have been a time fixed for the annual meeting, and the law imputes knowledge of this time to every stockholder. Nothing was done beforehand which tended to prevent a general attendance of stockholders at that meeting. On the contrary, there seems to have been a purpose to secure a full attendance. McCormack certainly intended to make his proposal, whatever his secret purpose in making it, at the meeting thus called. The president, at the beginning of the meeting, reported the difficulties of the corporation, and submitted his plan for surmounting them. There was opposition to McCormack's proposition, and, doubtless, discussion of it, since a resolution was adopted concerning it, and 30 shares of stock voted against it. It would have been an act of inconceivable folly on the part of a reasonable man, as Ramsey and his associates must be presumed to be, after he proclaimed in open meeting in the most formal way that he was acting in his own behalf, and setting forth the numerous things he proposed to do on the property for which he made his offer, in order to give value to the rest, afterwards to attempt to falsify his act and plan, and deceive the stockholders as to it, by causing an entry to be made on the minutes that some one else made his proposition, when he was well aware that every one who attended the meeting would know that the statement was false. All these occurrences related to important matters made at a time in the history of the corporation, when they were sure to attract attention among the stockholders.

The fidelity of one of the trustees selected to carry out the scheme is in no wise assailed by the bill, but it is alleged he was an honest man, and thought he was doing what was best for the corporation. It would be strange, if the plot was conceived as far back as stated, that such plotters would have selected an honest trustee to intervene between them and their evil purpose in getting the title in Mrs. Warner and putting it out of her and into the hands of the Ensley

Company. Is it natural, if such was their aim, that they would voluntarily have interposed a stumbling-block to the accomplishment of their designs in the person of an honest trustee, when they could as easily have selected a pliant instrument? The interposition of the Ensley Company as a conduit of title to the trustees, and the purchase of the town site from these trustees, by this same Ensley Company, which, just prior to that, had conveyed the property to these trustees, and that, too, in the face of the fact that a proposition to buy this same property had been made by Ramsey and associates, with whom the stockholders recommended the trustees to trade, was sure to excite and stimulate inquiry as to who promoted the Ensley Company, the purpose for which it was formed, and how the Ensley Company induced the trustees to sell to them the very property which the stockholders recommended the trustees to sell to Ramsey and associates. Any one knowing the facts—and stockholders were sure to know them—would instinctively connect Ramsey and associates in some way with the Ensley Company. The transaction, instead of concealing their identity, tended to divulge it. It seems almost incredible that sensible men, as we must presume respondents to be, would have adopted such a contrivance as holding out any hope of successfully veiling their scheme of obtaining the property for themselves and concealing their identity and interest from the knowledge of the stockholders, if they were actuated in the transaction by the motives and purposes now imputed to them. The subsequent conduct of McCormack and associates is utterly inconsistent with such a theory. About a month after McCormack made his proposal at the adjourned annual meeting, he and Ramsey openly purchased in their own behalf and name 10 acres of land from the trustees in the heart of the town site, including the hotel and other prominent buildings thereon, acting openly in taking possession, and spreading their deed upon the record. Shortly afterwards, they purchased in their own names 10 acres more from the trustees in another part of the town, and again put their deed on record. That part of the bill which sets forth notice of the published meeting at Birmingham makes as part of the bill a copy of the minutes, which contains a notice, signed by the president and secretary, addressed to the stockholders, stating that they would be asked to consider at the annual meeting a plan looking to the sale of the land by the Land Company, and that, as an incident to this, the stockholders would be asked to pass upon the policy of relinquishing the statutory right of redemption, etc. This circular further stated that a plan had been devised for dealing with the company's affairs which it was believed would prove satisfactory, and would undoubtedly redound to the interest of the stockholders, and concluded by urging attendance of all the stockholders, "as matters of vital importance" would be transacted at the meeting. The bill is silent whether this circular was ever issued or not, or whether complainants knew of it at or about that time. The language and posture of this circular copied verbatim upon the minutes, to which every stockholder had the right of access, immediately at the foot of the notice which was published, signed by the officers of the corporation, and addressed to its stockholders, leads to the conclusion

that it was intended for publication along with the formal notice for the meeting, which it is admitted was published, if, indeed, this circular was not in fact issued and published—a point the allegations of the bill do not settle. Whether or not it was published and sent out, its appearance upon the minutes shows the plan of liquidating the affairs of the company was not kept a guarded secret, but openly spread on the minutes at least, before the meeting at which it was expected to present the plan, and more than three weeks before it was actually presented to the assembled stockholders. Is it not a most probable and reasonable presumption, under these circumstances, that the matter had been discussed with creditors, and at least with some of the stockholders, beforehand, and that the steps taken just prior to the meeting were generally known to the creditors, if not to the stockholders generally? It is not certain from the allegations of the bill whether it intends to deny that a resolution was passed, as the minutes show, accepting McCormack's proposition under the name of the Ensley Company. May not the discrepancy in the state of the title, as stated, at the time the meeting was held, be reasonably and fairly accounted for on the presumption that the conveyances to the Ensley Company, and by it to Barker and Bowron, were but advance steps to put in operation the plan already agreed to by creditors, and not thought to be objectionable to the stockholders, in an honest effort to extricate the corporation from its difficulties, and save something to the stockholders? The Ensley Company after getting the Warner title, almost immediately conveyed all the lands it had bought, at about cost, to Barker and Bowron, with whom there had been, evidently, an understanding that the title should be transferred to them, and they would stand seised for the creditors and stockholders. As the law devoted the property to the very trust under which Barker and Bowron acknowledged they held it, the dealing with the Warner title, of itself, neither could nor did harm the corporation.

It is urged there was fraud in using the money of the Tennessee Company in redeeming the lands and getting them into the hands of the trustees. But how? If the Tennessee Company owed the Land Company, as charged, it was proper to use the money of the former company to protect the property of the Land Company in that way. If the Tennessee Company did not owe the money, directors could borrow from it, or might use their own money for such a purpose, without being guilty of the slightest misconduct. It is evident, whosoever's money it was, the Land Company has had an accounting as to it. That is an irresistible inference from the allegations and silence of the amended bill on these points. The correctness of the statement that the Tennessee Company would have come to the rescue and prevented the sale if it had been informed is overthrown by the fact that it did not do so, and allowed the property to remain in the hands of the trustees for some time, to be disposed of by them in meeting its debts. How long, the bill for some reason declines to inform the court.

Shook's statement as to the condition of the title, which was literally incorrect in several particulars at the time he made it to the stockholders, though not substantially erroneous as a general statement of

the condition of its affairs, could hardly have misled or been intended to mislead anybody as to its solvency and the sore straits to which. it was reduced. When a meeting of business men is told that it is proposed to relinquish the "statutory right of redemption" in property, the ordinary stockholder understands that his property has been sold, and nothing remains but the right given by the statute to get it back by paying the debt for which it was sold upon the terms prescribed by the statute. There were directors in the several boards of the Land Company during the next four years, who are not charged with complicity in these transactions, who were under duty to protect its interest, who certainly knew of the purchase at the time, and, as the court must suppose, were well acquainted with the value of the property sold. Is it reasonable to suppose that they would remain silent, and take no steps to protect their company, if they believed it had been wronged? McCormack and Ramsey, leaving out all question about the value of the undertakings in behalf of the Ensley Company, paid more for the 240 acres they purchased than the whole 3,700 acres brought under execution sale the year before. The Tennessee Company, which is the largest stockholder in the Land Company, certainly knew of these sales about the time they happened. It was at least watchful of the interest of the Land Company. It paid a large sum of money for it to the trustees, procured a conveyance from them to the Land Company, and for the Land Company, and, by its authority, settled with these trustees, at least for the property then in their hands, and doubtless knew what they had done with other portions not reconveyed. Yet, so far as the bill shows, neither that company nor any of the disinterested members of the boards of directors have, even to this day, made any complaint, or otherwise challenged any of these dealings. Much stress is laid upon the fact that the respondents, in acting as they did, while officers of the Tennessee Company, which was the majority stockholder of the Land Company, breached their trust to it. So far as that phase of the matter is concerned, the Tennessee Company alone can complain, and its attitude, as shown by the bill, for nearly four years prior to its filing, is certainly not one of disapproval or dissent. Whatever be the correct view, these transactions are certainly of no moment now, save as they shed light upon the bona fides of the purchase of the 240 acres.

In the light of all these things, but for the explicit statement that respondents concealed from the stockholders knowledge of the coming of the steel plant, and did not advise the trustees of the peculiar value of the lands sold—the town site—in view of the great increase in price which would naturally take place when the plant was built, the court, giving the conduct of the respondents the benefit of the common presumption in favor of the rectitude of men's intentions, would have no hesitation in saying, on a fair construction of the averments of the bill, that the respondents were not endeavoring to pave the way for their own aggrandizement in these transactions, but were rather honestly striving to extricate the property, as best they could, from its difficulties, and save it for the stockholders, and that in accomplishing that purpose they were either ignorant of the trammels which the law puts upon trustees in dealing with their cestuis que

trustent, or else, having acted openly, and with no bad motive, in the interest of the corporation, relied on their associates to approve what they did. On the positive charge as to the deceit and concealment, it must be held on demurrer that actual fraud was practiced in these purchases; but it is not inconsistent with the facts detailed to presume that the temptation to depart from rectitude came and was yielded to in the interval elapsing between the lodging of the title in Barker and Bowron and the meeting of the stockholders.

Much has been said by counsel on both sides in this connection, as to the right of the court to look to the character of the respondents in determining the motives for their acts. There may be cases where a judge may avail himself of personal knowledge of the high character of litigants, in passing upon the motives of their acts, in cases before him. This is not such a case. The question on demurrer is not whether the respondents are guilty of fraud, but whether, upon the allegations of the bill, fraud has been well charged. On an issue of this sort character sheds no light and can have no influence. Men of high character can commit fraud, and such men, though entirely guiltless, may be charged with fraud.

9. The next important question is whether the complainants have been guilty of laches, and, in that connection, the proper construction of the allegations of the amended bill. Is a stockholder, in a case like this, on an issue of laches between him and a fiduciary alleged to be a possessor mala fide, charged, as a matter of law, with knowledge or notice of the possession of parcels of corporate property by an officer or director, or thereby put under duty to trace how such officer holds the property and how he acquired it, as soon as he knew or should have known of such possession? If he has knowledge that his fiduciary has committed constructive fraud, does that knowledge charge him, without more, with actual knowledge or notice of the fraud or deceit in obtaining title or possession of the property? Some of the English authorities hold that it is no part of a nonmanaging shareholder's duty to look after the management of the corporate property, nor is it sufficient to show that he might have become acquainted with it. It must be shown that he did so. The American authorities generally, and certainly the courts of the United States, hold that "means of knowledge plainly within the reach of stockholders by the exercise of the slightest diligence is, in legal effect, the equivalent of knowledge." There is, however, no presumption of law that an absent stockholder, on an issue of laches between him and his fiduciary, either knew or did not know what was done at a regular or adjourned meeting of stockholders, which he did not attend, or as to the disposition the managers of his corporation have made of parts of corporate property in the conduct of its business. Such issues are to be solved as inferences of fact, in view of the comparative magnitude or insignificance of the transactions complained of, the openness and publicity attending it, the volume and nature of the business of the corporation, the extent of the territory in which its operations are carried on, the place where the transaction occurred, the value of the stockholder's interest in the corporation, his presence or absence from its home, the nature of his own pursuits, and all the surrounding circumstances which throw

light upon the question. With the vast multitude of corporations covering every field of business and industry, and the vast number of stockholders scattered in different parts of the country, at a distance from the operations of the corporation, and the frequent recurrence (sometimes by design and sometimes otherwise) of improper transactions which militate against the interests and rights of minority shareholders, it would not be promotive of justice, when the cestui que trust seeks to call his trustee to account, to hold, as matter of law, that adverse possession of a portion of the corporate property by an officer or agent of the corporation, for a period short of the bar of limitations, of itself charged the stockholder with notice or knowledge of how and when the property was obtained, or imputes to him knowledge of what was done at stockholders' meetings, which he did not attend. Laches is the creature of circumstances. It is inaction when, in good conscience, there should be action. Inactivity, when it is not blamable, is not laches. No one can be charged with negligence in the assertion of his rights unless he knew them, or is blamable for not knowing them. There is no such thing as acquiescence in a wrong unless there is notice or knowledge of that wrong. It must be remembered, in construing the amended bill, that it was intended to repel inferences of fact which the court felt compelled to draw in the particulars pointed in the former opinion. Nevertheless, the amended bill is still silent concerning many important questions of fact then discussed. The amended bill does not tell when complainants first learned of the plan of the president to put the property in the hands of trustees; no intimation is given of the date when the steel plant was erected, or when complainants first learned of the fact. The court is not informed when the Tennessee Company paid off the debts of the Land Company and its property was reconveyed to it, or what took place between the Land Company and its trustees as to the various transactions had by the trustees in disposing of the property which came into their hands. Nothing is stated as to when complainants first learned what took place at the stockholders' meeting of January 25, 1898. The general allegations of ignorance that Shook and McCormack had acquired the Warner judgment, that the sale was not necessitated by pressure of creditors, that the Ensley Company was organized for the benefit of respondents and they were acting adversely, is, by the language of the denials, limited to any period prior to the stockholders' meeting of January 25, 1898. For aught that appears, one of the complainants now before the court may have been one of the holders of the 30 shares of stock which voted against McCormack's proposition. The court is bound to presume that complainants knew of the constructive fraud on the part of the respondents in the purchase of the 240 acres of land at least shortly after these transactions happened. In this respect the amended bill is not materially different from the original bill, save in the statement that no change has taken place which would make it inequitable to rescind.

Giving due weight to the studied silence of the amended bill in the particulars pointed out, in what attitude does it place the complainants as to knowledge or notice of the deceit and concealment, the actual fraud charged, in the dealings with the trustees and stockholders, as

to the purchase of these 240 acres of land? Complainants knew, as must be inferred, long before the bill was filed, of the constructive fraud. They had ascertained who the Ensley Company was. They knew the steel plant had been built, and when; presumably a short time after the sale. They knew there had been a subsequent rise in the values of the property sold. They knew what property had been sold, and how it was situated with reference to the steel plant. The bill, however, avers explicitly that there were no records on the books of the Tennessee Company or of the Land Company which would have disclosed the actual fraud charged, or put the Land Company, or any of its disinterested officers and stockholders, on inquiry. Complainants aver explicitly that they never entertained suspicion of the good faith or rectitude of the defendants in the transactions complained of, but, on the contrary, trusted and confided in them until put upon notice by a speech made by one of the defendants, the substance of which is given, at Ensley, about July, 1901, when they commenced to prosecute inquiry, etc. They aver that they were ignorant of the actual fraud for these reasons. Do the facts admitted by the bill, fairly construed, disprove or overthrow the last assertion? Conceding that the respondents knew of the proceedings at the stockholders' meeting, and that the Ensley Company was in possession of the lands bought by it, and McCormack and Ramsey were in possession of the 20 acres bought by them, and also when the steel plant was erected, does that charge complainants with knowledge that respondents concealed or withheld knowledge of the expected building of the steel plant from their fellow shareholders, or from their trustees when they purchased from them? Certainly the possession of the land did not give notice of the actual fraud. It shows only a constructive fraud. A purchase by a trustee is not necessarily fraudulent in fact or in morals. Complainants might have been willing to waive a fair purchase from their trustees, when they would not have been willing for the purchase to stand, if they had known it was tainted with actual fraud. Certainly the things which complainants knew would, to prudent minds, have suggested inquiry, whether knowledge of the building of the steel plant had been withheld from the stockholders, which would have developed the fact. Complainants did not inquire, and remained in actual ignorance. Are the respondents at fault for not making the inquiry? They were dealing with their trustees. They had a right to presume that they would not be guilty of any actual fraud. They had a right to rely upon that presumption, and not to watch or suspect them. If complainants did not make the inquiries, they would not be blamable, as between themselves and the trustees, where the failure to inquire and consequent ignorance grew out of confidence in the trustees, and the fact that the fraud was concealed as charged. Kilbourn v. Sunderland, 130 U. S. 519, 9 Sup. Ct. 594, 32 L. Ed. 1005; Thompson v. Finch, 22 Beavan, 325; Larzelere v. Starkweather, 38 Mich. 96; Jones v. Smith, 1 Hare, 109. Knowledge of other things which must be imputed to complainants, unaccompanied by the statements here made that there was actual ignorance of the deceits charged, and that suspicion had not been aroused, would have led to the inferences of fact, drawn on demurrer to the original bill, that suspicion had developed inquiry which had been followed

up, and led to the knowledge of the fraud complained of, long before the filing of the bill. If such had been the fact, it would have put complainants, in view of the long delay which has occurred, in the attitude of expectant watchers, waiting to affirm or disavow the transaction as their interest might suggest, speculating upon respondents; an attitude which of itself would require a court to decline relief as regards property under the changing conditions here involved. Complainants, however, explicitly aver that their reliance upon respondents prevented suspicion and lulled inquiry, and that, in consequence, they were actually ignorant of the fraud which it is alleged was concealed, until complainants discovered it shortly before the filing of the bill.

The case, as now presented, is no longer one where complainants have acquiesced, at least as to the actual fraud charged. In reaching this conclusion, the court has not been unmindful that long delay has elapsed before complaint was made; that only the holders of these few shares are asking to set aside transactions which its several boards of directors and vast majority of stockholders have neither assailed, nor shown any disposition to assail, after being invited to do so by this bill, which, with its array of charges, has been pending for many months; nor that it seems strange, in view of the knowledge that must be imputed to complainants in the matters to which we have referred, that complainants did not earlier entertain suspicion and prosecute inquiry which would have long since led to the discovery of the grievances complained of. The court, however, cannot find complainants guilty of laches in these respects without breaking down the principle that the cestui que trust may assume the rectitude of his trustee, and has the moral and legal right to indulge full confidence, without making inquiry, even when he does not understand a transaction, until knowledge, direct or indirect, actually comes home to him who reposes confidence that his trustee has wandered from the paths of rectitude. Until then the law does not require him who gives confidence to watch or suspect him in whom the confidence is reposed. If the confidence is in fact reposed, and the cestui que trust is lulled into fancied security, and therefore does not watch or suspect, and thus remains in actual ignorance, it would assail the usefulness and integrity of the trust relation to absolve the trustee of accountability because the cestui que trust should have suspected the trustee's infidelity, and earlier ascertained the truth, if he had not extended such ample confidence to one whom he had the right to trust implicitly. A trustee, on an issue of good faith with the cestu que trust, cannot be heard to say, in a court of equity, that a cestui que trust, who in fact remained in ignorance of actual fraud because he trusted, would not have been so long ignorant if he had not trusted too much, and was therefore guilty of laches in the measure of confidence extended. A trustee in possession mala fide cannot avail himself of changed circumstances growing up in the interval between the commission of a concealed fraud and its discovery to defeat rescission when the cestui que trust, who remained in actual ignorance by reason of trust in him, acts promptly on discovery.

10. It is objected by the demurrers that complainants do not properly offer to do equity, and restore the status quo, and that the creditors of the Ensley Land Company are not made parties. It appears

from the amended bill that the debts due creditors have been paid by the Tennessee Company. There are, therefore, no longer any creditors to be affected by the decree herein. The bill does not contain a general offer to do equity, or to submit to and abide by such orders as to equity may seem meet. It does, however, allege in a general way that some of the property has been sold to bona fide purchasers, and therefore cannot be restored to the complainants. It prays for an accounting, etc., and concludes, "And complainants hereby offer to allow a credit to the defendants for all sums lawfully expended for said Ensley Land Company, or which inured to its benefit." It is evident from the bill, if complainants prove their case, there must be an accounting. While the bill shows the payment of considerable sums of money inuring to the benefit of the Land Company for which respondents will be entitled to credits, the amounts for which respondents may be debited on account of sales of land to bona fide purchasers does not appear. The prayer to set aside the conveyances and for an accounting, and the offer to allow a credit for all expenditures which inured to the benefit of the Land Company, bind the complainants to all the consequences of rescission and an accounting, and authorize the court, if the state of the accounts require it, to render a decree in favor of the respondents for any balance due them, without a more specific offer of equity, and to make all proper decrees to fully restore the status quo. Goldthwaite v. Day, 149 Mass. 187, 21 N. E. 359; Miller v. L. & N. R. R. Co., 83 Ala. 275, 4 South. 842, 3 Am. St. Rep. 722; Cumberland Coal & Iron Co. v. Sherman et al., 20 Md. 133. At this stage of the proceedings the offer is sufficient.

The special demurrers to so much of the bill as seeks to vacate and annul the sheriff's sale under the Warner judgment, the conveyances to the Ensley Company, its conveyance to Barker and Bowron, their declaration of trust, and the conveyance made by Shook pursuant to the resolution of the stockholders, releasing the right of redemption, etc., are well taken. The other demurrers are not well taken, and will be overruled. A decree may be presented sustaining and overruling the demurrers on the points stated, in conformity with the opinion, giving the respondents 40 days in which to answer.